# United States Court of Appeals
## For the First Circuit

No. 08-1683

DAVID BERGERON ET AL.,

Plaintiffs, Appellees,

v.

SHERIFF ANDREA CABRAL,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Siler,** Circuit Judges.

Ellen M. Caulo, Deputy General Counsel, Suffolk County Sheriff's Department, for appellant.
Stephen C. Pfaff, with whom Louison, Costello, Condon & Pfaff, LLP was on brief, for appellees.

March 9, 2009

*Of the Sixth Circuit, sitting by designation.

**SELYA**, **Circuit Judge**.  This interlocutory appeal requires us to determine whether defendant-appellant Andrea Cabral, the duly elected Sheriff of Suffolk County, Massachusetts, is entitled to qualified immunity in connection with her decision to strip several jail officers of their commissions as deputy sheriffs, allegedly in retaliation for their support of her opponent during the 2004 election cycle.  The district court, after concluding that decommissioning amounts to an adverse employment action, denied the defendant's motion for summary judgment based on qualified immunity.  The defendant appeals on two grounds.  Although we lack jurisdiction to consider one ground on interlocutory review, we do have jurisdiction to consider the other.  After careful consideration of that ground, we affirm the order denying brevis disposition.

## I.  BACKGROUND

We draw the relevant facts from the summary judgment record and rehearse them in the light most flattering to the nonmovants (here, the plaintiffs).  See Cox v. Hainey, 391 F.3d 25, 27 (1st Cir. 2004).

This action was brought by ten correctional officers employed at the Nashua Street Jail, a penal facility operated by the Suffolk County Sheriff's Department (the Department).  All of them were members of either the Jail Officers and Employees Association (JOEA) or some other public employees' labor union.

-2-

Because this appeal implicates only six of the ten jail officers (David Bergeron, John Grennon, John Barnes, John Ellis, Lorne Lynch, and Al Moscone), we refer to those six jail officers as the plaintiffs.

On November 29, 2002, the governor appointed the defendant as Sheriff to complete an unexpired term. Shortly thereafter, she commissioned the plaintiffs, among others, as deputy sheriffs. See Mass. Gen. Laws ch. 37, § 3. A deputy-sheriff commission is not a prerequisite for service as a jail officer. Some jail officers hold such commissions; others do not.

Starting in the spring of 2003, the defendant became embroiled in an acrimonious contractual dispute with the JOEA. That dispute spilled over into the political arena. As a result, the JOEA disseminated mass mailings and a press release soliciting support for its cause. To add insult to injury, the JOEA endorsed Stephen J. Murphy, the defendant's opponent in the 2004 Democratic primary for election as Sheriff.

The plaintiffs all participated in the campaign (albeit to varying degrees). Three of them — Grennon, Barnes, and Ellis — played key roles in the propagation of mailings and a press release calumnizing the defendant. A fourth, Moscone, raised funds for Murphy's campaign coffers, contributed money of his own, and made telephone calls to assist Murphy's bid for election. A fifth, Lynch, attended at least one Murphy fundraiser. The sixth,

-3-

Bergeron, held a sign advocating Murphy's election at a polling place in West Roxbury on primary day.

Despite the plaintiffs' efforts, the defendant won the primary and ran unopposed in the November general election. Her first full term as Sheriff commenced on January 5, 2005. Approximately three months later, she rescinded the plaintiffs' commissions and transferred several of them to less desirable assignments.

The plaintiffs were not pleased. Invoking 42 U.S.C. § 1983, they joined in bringing suit in federal district court. Their complaint alleged that the defendant had retaliated against them because of their union activities and/or their political affiliation, in violation of the First Amendment.

After the close of discovery, the defendant moved for summary judgment on the ground that the plaintiffs had failed to introduce sufficient evidence to support their First Amendment claims and, in the alternative, that qualified immunity barred those claims. The court below granted the motion in part and denied it in part. Bergeron v. Cabral, 535 F. Supp. 2d 204, 216 (D. Mass. 2008).

Pertinently, the court determined that the six plaintiffs had adduced evidence adequate to raise a genuine issue of material fact as to whether each of them had suffered an adverse employment action because of political affiliation. Id. at 214. The court

-4-

also held that the defendant was not entitled to qualified immunity on this set of claims.  Id. at 215-16.

On appeal, the defendant challenges the district court's denial of qualified immunity.  No other ruling is ripe for review.

## II.  ANALYSIS

Qualified immunity is a judge-made construct that broadly protects public officials from the threat of litigation arising out of their performance of discretionary functions.  Pagán v. Calderón, 448 F.3d 16, 31 (1st Cir. 2006).  The defense is available to public officials whose "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Because qualified immunity confers a right "not to stand trial or face the other burdens of litigation . . . rather than a mere defense to liability," Mitchell v. Forsyth, 472 U.S. 511, 526 (1985), a pretrial rejection of qualified immunity may give rise to an interlocutory appeal.

The key word in this last sentence is "may."  In the pages that follow, we mull the threshold question of appellate jurisdiction.  We then address those aspects of the appeal that we have jurisdiction to hear.

### A.  Appellate Jurisdiction.

In broad-brush terms, an interlocutory appeal may be taken from the denial of qualified immunity when the immunity issue

-5-

is a purely legal one, that is, when resolving the issue does not require either choosing among conflicting facts or second-guessing the district court's conclusion that a genuine issue of material fact bars any immediate relief. Pagán, 448 F.3d at 26; Camilo-Robles v. Hoyos (Camilo-Robles I), 151 F.3d 1, 8 (1st Cir. 1998). Accordingly, when the district court assumes a set of facts favorable to the plaintiff and decides as a matter of law that those facts do not form a satisfactory basis for a finding of qualified immunity, an interlocutory appeal is available under the collateral order doctrine. See Behrens v. Pelletier, 516 U.S. 299, 313 (1996).

Here, the defendant has advanced two main theories in support of her assertion that she is shielded by qualified immunity. We perform the necessary triage.

The defendant's first theory is that decommissioning is not an adverse employment action (or, at least, that the law in that area lacks a clear focus). Thus, regardless of any animus on her part, the plaintiffs were not deprived of any clearly established constitutional right.

We have jurisdiction to consider this argument. There is no dispute about either the fact of decommissioning or the benefits that a commission entails. Seen in this light, the multifaceted question of whether decommissioning is an adverse employment action and if so whether a reasonable officer in the defendant's position

should have known as much fits neatly within the integument of the collateral order doctrine. See, e.g., Shockency v. Ramsey County, 493 F.3d 941, 948-51 (8th Cir. 2007) (considering on interlocutory appeal whether employees had suffered adverse employment action and whether law to that effect was clearly established); Bass v. Richards, 308 F.3d 1081, 1087-88 (10th Cir. 2002) (similar).[1]

The defendant's second theory is a horse of a different hue. She claims that the decommissioning was part of a comprehensive merits-based reform and that she is entitled to immunity because there is insufficient record evidence that the decision was driven by political animus. But the plaintiffs presented evidence that their political affiliation played a crucial role in bringing about the decommissioning, and the district court determined that this evidence permitted a reasonable inference that the defendant knew of the plaintiffs' support for Murphy and punished them as a result. Bergeron, 535 F. Supp. 2d at 214. Since the district court discerned a genuine issue of material fact as to the defendant's motivation, we lack jurisdiction to review the issue on an interlocutory appeal. See

---

[1] We have suggested that the existence of an adverse employment action may be a question for the jury when there is a dispute concerning the manner in which the action taken affected the plaintiff-employee. See Rivera-Jiménez v. Pierluisi, 362 F.3d 87, 94 (1st Cir. 2004). Here, however, it is clear what effect decommissioning had on the plaintiffs' positions. Consequently, the adversity vel non of that action is a legal question properly reviewable on interlocutory appeal.

Valdizán v. Rivera-Hernández, 445 F.3d 63, 65 (1st Cir. 2006); Cruz-Gómez v. Rivera-Hernández, 444 F.3d 29, 33-34 (1st Cir. 2006); Camilo-Robles v. Zapata (Camilo-Robles II), 175 F.3d 41, 46-48 (1st Cir. 1999).

To recapitulate, we have jurisdiction to resolve the defendant's first ground for qualified immunity: that decommissioning does not constitute an adverse employment action, cognizable in a First Amendment retaliation suit (or, at the very least, that a reasonable public official would have believed that to be so). Conversely, we lack jurisdiction over the defendant's second theory of qualified immunity: that the record evidence is insufficient to support a finding that she acted out of political animus in decommissioning the plaintiffs. We limit our substantive discussion accordingly. See, e.g., Valdizán, 445 F.3d at 65-66 (exercising jurisdiction over legal basis of denial of qualified immunity but eschewing review insofar as denial was premised on district court's determination that genuine issues of material fact existed); Díaz v. Martínez, 112 F.3d 1, 4-5 (1st Cir. 1997) (similar).

## B. The Qualified Immunity Inquiry.

A district court's ruling granting or denying a summary judgment motion premised on qualified immunity engenders de novo review. See, e.g., Cox, 391 F.3d at 28; Camilo-Robles I, 151 F.3d at 11. Over time, we have cultivated an ordered, three-step

inquiry designed to determine whether a public official is entitled to qualified immunity.  See, e.g., Pagán, 448 F.3d at 31; Cox, 391 F.3d at 29-30.  Under that framework, we ask "(i) whether the plaintiff's proffered version of the facts, if true, makes out a violation of a constitutionally protected right; (ii) . . . whether that right was clearly established at the time of the putative violation; and (iii) . . . whether a reasonable public official, situated similarly to the defendant, should have understood the challenged act or omission to violate the discerned right." Morelli v. Webster, 552 F.3d 12, 18 (1st Cir. 2009).  If we answer any of these queries in the negative, the assertion of qualified immunity prevails.[2]

The Supreme Court recently held that these steps need not be taken in strict sequence.  Pearson v. Callahan, 129 S. Ct. 808, 818 (2009) (abrogating Saucier v. Katz, 533 U.S. 194, 201 (2001)). Pearson creates a pathway to flexibility.  It does not in any way preclude courts from going step by step.  See id.  Because the parties briefed and argued the case at hand pre-Pearson, it makes sense to adhere to a sequential mode of analysis here.  We proceed in that fashion.

---

[2] We occasionally have compressed these three steps into two. See, e.g., Santana v. Calderón, 342 F.3d 18, 23 (1st Cir. 2003); Dwan v. City of Boston, 329 F.3d 275, 278 (1st Cir. 2003).  The three-step approach is functionally equivalent to the two-step approach and, in all events, our resolution of this appeal would be the same regardless of which methodology we employed.

1.  **The First Prong**.  It is apodictic that the First Amendment insulates public employees who hold nonpolicymaking positions from the vicissitudes of personnel decisions rooted in partisan political concerns.  See, e.g., Rutan v. Repub. Party of Ill., 497 U.S. 62, 74-76 (1990).  In order to make out a claim for political retaliation, a public employee who holds a nonpolicymaking position must show both that he was subjected to an adverse employment action and that his politics were a substantial or motivating factor for that action.  González-Pina v. Rodríguez, 407 F.3d 425, 431 (1st Cir. 2005).

For reasons already explained, see supra Part II(A), we must accept as a given that the plaintiffs have succeeded in raising a genuine issue of material fact as to the second of these elements.  Thus, our inquiry is limited to the first element.  Moreover, because the defendant has not argued to the contrary, we must accept that Suffolk County deputy sheriffs do not occupy policymaking positions for which political loyalty would be an appropriate qualification.  The question, then, reduces to whether stripping the plaintiffs of their commissions as deputy sheriffs constituted an adverse employment action.

The term "adverse employment action" arose in the Title VII context as a shorthand for the statutory requirement that a plaintiff show an alteration in the material terms or conditions of his employment.  See Power v. Summers, 226 F.3d 815, 820 (7th Cir.

2000); see also 42 U.S.C. § 2000e-2(a)(1). Though analogous in other respects, a section 1983 suit is not subject to any similar statutory imperative. Rather, the "adverse employment action" inquiry in the section 1983 context focuses on whether an employer's acts, viewed objectively, place substantial pressure on the employee's political views. See Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1218 (1st Cir. 1989) (en banc); see also Power, 226 F.3d at 820-21.

Discharge is the paradigmatic example of such an adverse employment action. See, e.g., Elrod v. Burns, 427 U.S. 347, 372-73 (1976) (plurality op.); Gómez v. Rivera Rodríguez, 344 F.3d 103, 110 (1st Cir. 2003); Vázquez Ríos v. Hernández Colón, 819 F.2d 319, 324 (1st Cir. 1987). But under this rubric, acts short of outright dismissal may be sufficiently adverse to undergird claims for political retaliation. See Rutan, 497 U.S. at 74-75.

In Agosto-de-Feliciano, this court, sitting en banc, held that employment actions are sufficiently adverse to support a section 1983 claim bottomed on the First Amendment if those actions, objectively evaluated, would "place substantial pressure on even one of thick skin to conform to the prevailing political view." 889 F.2d at 1218. We further stated that this level of burdensomeness is reached "when the employer's challenged actions result in a work situation 'unreasonably inferior' to the norm for the position." Id. It follows that a substantial alteration in an

-11-

employee's job responsibilities may constitute an adverse employment action. See id. at 1219. The standard enunciated in Agosto-de-Feliciano survived the Rutan Court's subsequent decision, see Martínez-Vélez v. Rey-Hernández, 506 F.3d 32, 42 & n.7 (1st Cir. 2007) (collecting cases), and we apply that standard here.

Jobs come in a kaleidoscopic array of colors, shapes, and sizes. Moreover, they are performed under a wide variety of circumstances and with a wide variety of perquisites. The decision as to what constitutes an adverse employment action must take account of these variations. Nevertheless, the cases provide some guidance.

To begin, we have ruled that depriving an employee of the bulk of his job responsibilities is an adverse employment action. Bisbal-Ramos v. City of Mayagüez, 467 F.3d 16, 22-23 (1st Cir. 2006) (collecting cases). So, too, the denial of "special benefits and assignments" arising in the normal course of an employment may comprise an adverse employment action. Rivera-Jiménez v. Pierluisi, 362 F.3d 87, 94-95 (1st Cir. 2004). These decisions, however, are merely background for present purposes; the case at hand is a "diminished compensation" case.

More to the point, we have recognized that tinkering with an employee's duties or prerogatives in a way that creates a realistic potential for pecuniary loss may impose substantial pressure on the employee such as to implicate his First Amendment

-12-

rights. The most obvious example is a garden-variety salary reduction, which unarguably constitutes an adverse employment action. See, e.g., Acosta-Orozco v. Rodríguez-de-Rivera, 132 F.3d 97, 101 (1st Cir. 1997); Jirau-Bernal v. Agrait, 37 F.3d 1, 4 (1st Cir. 1994).

Some of our cases go farther down this road. In Welch v. Ciampa, 542 F.3d 927 (1st Cir. 2008), we held that a superior's failure to reappoint a detective as a detective sergeant constituted an adverse employment action because loss of the title entailed the loss of "the additional stipend that accompanied [that title] as well as the opportunity for substantial overtime pay and additional pay related to detail and court assignments." Id. at 936. Similarly, in Martínez-Vélez, we held that the denial of overtime opportunities may constitute an adverse employment action. 506 F.3d at 40.

Here, it is transparently clear that the Department offered the opportunity to work paid security details only to jail officers who were commissioned as deputy sheriffs. Consequently, when the defendant stripped the plaintiffs of their commissions, she excluded them from any chance of staffing such details. That act effectively reduced the plaintiffs' earning capacity. We believe that this constriction of job responsibilities and the concomitant reduction in earning capacity combined to constitute an

-13-

adverse employment action.[3]  See Welch, 542 F.3d at 936; Martínez-Vélez, 506 F.3d at 40; cf. Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996) (holding in context of FLSA retaliation claim that an adverse employment action generally occurs when employer "(1) take[s] something of consequence from the employee" or "(2) withhold[s] from the employee an accouterment of the employment relationship").

The defendant challenges this conclusion, suggesting that the number of available security details has declined sharply. This boils down to a suggestion that the decommissioning wrought such minuscule pecuniary loss that it cannot be deemed an adverse employment action.

We need not speculate on the suggestion that, under certain circumstances, the loss of an opportunity to earn paltry amounts might not constitute an adverse employment action.  Cf. Rhodes v. Ill. Dep't of Transp., 359 F.3d 498, 505 (7th Cir. 2004) (holding, in Title VII case, that loss of a single day's pay did not constitute adverse employment action).  The situation here is different.  The plaintiffs were decommissioned in April of 2005. The record shows that deputy sheriffs worked 4,878 security details

---

[3] The plaintiffs allege that decommissioning had certain other infelicitous effects, such as rendering them ineligible to work in prisoner transport.  Some of them also allege that they were transferred to unreasonably inferior job assignments.  Because the deprivation of the opportunity to work security details is enough, in itself, to qualify decommissioning as an adverse employment action, we do not probe these other allegations.

-14-

in that calendar year. The potential earning capacity that these opportunities presented is well-illustrated by plaintiffs Lynch (who during the first three and one-half months of 2005 worked 120 hours on security details, earning $3,360) and Moscone (who during the same interval worked 86 hours on security details, earning $2,436). Nor were these figures a fluke: Lynch had earned well over $20,000 from security details in each of the two preceding years, and Moscone had earned comparable sums. Extrapolating from these data, it is fair to draw the inference that a commissioned deputy sheriff had the capacity to earn several thousand dollars of extra compensation annually.

Decommissioning foreclosed those opportunities completely. Such a deprivation was a heavy price to pay for campaigning against the Sheriff and, thus, the threat of decommissioning is a classic example of pressure designed to coerce political orthodoxy. That deprivation is therefore sufficient to ground a finding of an adverse employment action.

The fact that there may have been fewer security details available in the years after the decommissioning does not mitigate the force of this conclusion. If this fact is proffered as a justification for decommissioning the plaintiffs, we lack jurisdiction to consider it on this appeal. See supra Part II(A). If, however, the fact is proffered as a reason why decommissioning is not an adverse employment action, it lacks bite: the relevant

inquiry is whether an employer's actions, viewed objectively, placed inordinate pressure on employees to conform to prevailing political orthodoxy. See Agosto-de-Feliciano, 889 F.2d at 1218.

In the instant case, that pressure would have been calibrated to the amount of additional money a deputy sheriff could expect to earn in the spring of 2005. Absent a showing that the plaintiffs at that time knew that there would be fewer security details available in the future — and no such showing has been forthcoming — the slump in requests for security details is beside the point.

The defendant's fallback position seems to be that even if decommissioning is an adverse employment action as to Lynch and Moscone, it is not as to the remaining plaintiffs. In this regard, she points out that Grennon worked security details sporadically, and none from 2003 through 2005; that Bergeron worked only one security detail in 2004 and none in 2005; and that neither Barnes nor Ellis ever opted to work on security details. Because these four plaintiffs did not work security details with any frequency, the defendant asseverates, decommissioning was not sufficient to underpin their First Amendment claims.

This is anfractuous reasoning. As a matter of law, the determination as to whether conduct constitutes an adverse employment action must be made based on objective criteria. The opportunity to work security details and earn extra money is an

attractive benefit that accrues to all commissioned deputy sheriffs. Foreclosing that opportunity is an adverse employment action with respect to any and all similarly situated deputies. See Welch, 542 F.3d at 936; Martínez-Vélez, 506 F.3d at 40. Accordingly, each of the six plaintiffs felt the sting of an adverse employment action.

Taking a closely related tack, the defendant asserts that the plaintiffs did not suffer an adverse employment action because they lost only the ability to earn outside income; that is, to supplement their normal wages with monies derived from sources outside the Department. In support, the defendant notes that a jail officer does not require a commission to perform his regular duties; that jail officers who are deputy sheriffs are forbidden from working security details that interfere with their regular work assignments; and that the agencies for which deputy sheriffs perform security details pay for the deputies' services. Thus, the defendant's thesis runs, any loss of earning capacity arose outside the scope of the plaintiffs' employment and cannot constitute an adverse employment action.

This thesis is riddled with imperfections. The most prominent flaw is that it rests on an incorrect factual predicate. The record makes manifest that whereas security details involve work that is not part of a jail officer's obligatory duties, see Sheriff of Middlesex County v. Int'l Bhd. of Corr. Officers, 821

-17-

N.E.2d 512, 514 (Mass. App. Ct. 2005), those details do not transpire outside the contours of a deputy's employment relationship with the Department.[4]  We explain briefly.

In a very real sense, the Department owns the security details.  It establishes the criteria for the work, maintains the roster of eligibles, sets the rotation, assigns deputies to particular details, provides the gear to be used, and enjoins deputies to abide by departmental policies while working security details.  Individual deputy sheriffs are expressly forbidden from either free-lancing or negotiating separately with outside agencies in connection with the provision of security details.  Moreover, the Department instructs deputy sheriffs that, while working security details, they are "emissar[ies] of the Suffolk County Sheriff's Department."

To cinch matters, the defendant conceded at oral argument that the Department actually pays deputy sheriffs for the work that they do on security details.  Indeed, the payments appear as line

_____

[4] In an analogous context, the Supreme Court has held that the anti-retaliation provision of Title VII, unlike the statute's substantive provisions, "extends beyond workplace-related or employment-related retaliatory acts and harm." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006). Because we find that the retaliation alleged here was employment-related, we need not consider whether a First Amendment retaliation claim may likewise be premised on retaliatory acts that are not employment-related.

-18-

items on the recipient's normal paycheck.[5] Under these circumstances, we reject the defendant's claim that remuneration for security details is a matter arising outside the employment relationship between the Department and deputy sheriffs as a class.

The short of it is that the opportunity to work on security details is a customary and valuable incident of a deputy sheriff's employment. The defendant foreclosed that opportunity by decommissioning the plaintiffs, presumably because of their political stance. It follows that the plaintiffs have suffered an adverse employment action and, thus, have prevailed on the first furculum of the qualified immunity inquiry.

2. **The Second Prong**. The second prong of the qualified immunity inquiry requires an objective appraisal of the state of the law at the time of the challenged act (here, the decommissioning). See Iacobucci v. Boulter, 193 F.3d 14, 21 (1st Cir. 1999). The crucial question is whether the contours of the relevant right "were sufficiently well-defined that a reasonable official would have understood that his actions violated that right." Hatch v. Dep't for Children, Youth & Their Families, 274 F.3d 12, 22 (1st Cir. 2001).

In answering this question, "an inquiring court must look back in time and conduct the juridical equivalent of an

---

[5] The Department apparently acts as a conduit for these sums and is reimbursed by the agencies that have requested the security details.

archeological dig." Savard v. Rhode Island, 338 F.3d 23, 28 (1st Cir. 2003) (en banc). The court should search the relevant authorities both in circuit and out of circuit. Hatch, 274 F.3d at 23. In order to show that a principle is clearly established in the pertinent sense, a plaintiff ordinarily must identify "cases of controlling authority . . . at the time of the incident . . . [or] a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." Wilson v. Layne, 526 U.S. 603, 617 (1999). Throughout, the court should take care to focus on the particulars of the case at hand.

That is not to say that, like in a dog-bite case at common law, the first bite is always free. See, e.g., Burton v. Moorhead, (1881) 8 R. 892, 895 (Sess.) (Scot.). The qualified immunity defense does not furnish public officials with an absolute license to subject citizens to deprivations of constitutional rights simply because the underlying fact pattern is new. See Hope v. Pelzer, 536 U.S. 730, 741 (2002) (explaining that public officials may be deemed to "be on notice that their conduct violates established law even in novel factual circumstances"); Limone v. Condon, 372 F.3d 39, 48 (1st Cir. 2004) (similar). In other words, a plaintiff need not show that the conduct of which he complains is an exact replica of conduct that previously has been held unlawful. Anderson v. Creighton, 483 U.S. 635, 640 (1987). In the last analysis, a plaintiff may satisfy the second prong of

-20-

the qualified immunity inquiry by showing that the relevant legal principles were both specific enough and sufficiently well-established that the unlawfulness of the defendant's conduct ought to have been apparent.  See id.; Limone, 372 F.3d at 44.

As said, the decommissioning took place in April of 2005. At that time, it was settled beyond hope of contradiction that a garden-variety reduction in pay constituted an adverse employment action.  See, e.g., Acosta-Orozco, 132 F.3d at 101; Jirau-Bernal, 37 F.3d at 4; Agosto-de-Feliciano, 889 F.2d at 1218 n.8.  It was equally well-settled that an employer could not deny an employee a promotion or otherwise significantly retard the employee's eligibility for wage increases because of the employee's exercise of First Amendment rights.  See, e.g., Rutan, 497 U.S. at 76; McCabe v. Sharrett, 12 F.3d 1558, 1564 (11th Cir. 1994); Roque-Rodríguez v. Lema Moya, 926 F.2d 103, 107 (1st Cir. 1991).

Accordingly, the case law of the Supreme Court and this circuit alone establish that there was fair notice that a reduction in income controlled by the employer was actionable.  There is no need to go beyond that; we accept the principle that a single out of circuit case would not alone be enough.  But we think it germane to note that there was at least one such case decided prior to the decommissioning that had haunting parallels to this case.[6]

---

[6] A second highly analogous case, Welch, 542 F.3d at 936, resolved by this court, was not decided until after the Sheriff took away the plaintiffs' commissions.

-21-

In Bass, the Tenth Circuit, following an agnate line of reasoning, had held that a sheriff's decision to rescind the commission of a reserve deputy constituted an adverse employment action under what that court viewed as clearly established First Amendment principles. See Bass, 308 F.3d at 1088. The court rested its holding on a finding that the commission constituted a valuable benefit, allowing its holder to effectuate arrests and conduct investigations. Id.

The plain import of these decisions is that, by 2005, it was clearly established that public officials could not significantly impact an employee's compensation or earning capacity on the basis of the employee's political affiliation. Inasmuch as a deputy-sheriff commission offers a jail officer the potential to garner substantial financial benefits, it was clearly established when the defendant acted that she could not deprive a jail officer of his commission out of political animus. Thus, the plaintiffs have satisfied the second prong of the qualified immunity inquiry.

3. **The Third Prong**. The third prong of the qualified immunity inquiry is qualitatively different from the first two prongs. "While the first two steps . . . deal with abstract legal principles, the final step deals with the facts of the particular case." Hatch, 274 F.3d at 24. The inquiry at step three is "whether it would have been clear to an objectively reasonable official, situated similarly to a particular appellant, that the

actions taken or omitted contravened the clearly established right." Limone, 372 F.3d at 48. In many cases, the fact that the relevant law is clearly established is dispositive at step three "since a reasonably competent public official should know the law governing his conduct." Harlow, 457 U.S. at 819.

Notwithstanding this generalization, public officials sometimes may find safe haven at the third step of the qualified immunity pavane. The key consideration is whether the official can demonstrate that he has made a reasonable, though mistaken, judgment. See, e.g., López-Quiñones v. P.R. Nat'l Guard, 526 F.3d 23, 27-28 (1st Cir. 2008); Duriex-Gauthier v. López-Nieves, 274 F.3d 4, 11 (1st Cir. 2001). So, if the defendant could reasonably have believed that she could decommission the plaintiffs with impunity on the basis of their political advocacy, she would be entitled to qualified immunity.

Endeavoring to convince us on this point, the defendant declares that she has unfettered statutory authority to commission and decommission deputy sheriffs at her pleasure. Thus, she reasonably believed that she had power to decommission the plaintiffs for any reason that struck her fancy, including political affiliation. This analysis is faulty.

We start with the proposition, urged by the defendant, that the plaintiffs had no inalienable "right" to their commissions. But there is another relevant proposition, not

controverted by the defendant, that partisan political loyalty is not a legitimate qualification for a deputy sheriff's position. Public officials have long been on notice that, even when they have authority to take a discretionary action for virtually any reason, there are certain reasons — race, gender, religion, to name a few — upon which they may not rely in exercising their discretion to bestow or withdraw valuable government benefits. See Gratz v. Bollinger, 539 U.S. 244, 275-76 (2003) (race); United States v. Virginia, 518 U.S. 515, 545-46 (1996) (gender); Thomas v. Review Bd. of Ind. Empl't Sec. Div., 450 U.S. 707, 717-18 (1981) (religion). Under First Amendment principles, political affiliation is such a proscribed reason. See Branti v. Finkel, 445 U.S. 507, 512 n.6 (1980); Elrod, 427 U.S. at 372-73; Cheveras Pacheco v. Rivera González, 809 F.2d 125, 127-28 (1st Cir. 1987).

In this case, the defendant made a calculated decision to decommission several deputy sheriffs who had opposed her bid for office. She acted deliberately and purposefully. When this type of executive decision violates clearly established law, it is much harder to justify than when a public official makes a split-second judgment in the heat of the moment. See, e.g., Estate of Bennett v. Wainwright, 548 F.3d 155, 175-76 (1st Cir. 2008) (holding that officers were entitled to qualified immunity on excessive force claim because they reasonably — even if mistakenly — could have believed that decedent posed continuing, imminent threat);

-24-

Rodríguez-Rodríguez v. Ortiz-Vélez, 391 F.3d 36, 41 (1st Cir. 2004) (terming "a close-call case of probable cause to arrest" an "easy example" of a situation where qualified immunity would apply).

Given the clarity of the law in April of 2005, we do not think that any reasonable public official could have thought that she could divest those who opposed her political aspirations of the opportunity to work lucrative details while leaving her political supporters free to cash in on those opportunities. Accordingly, the plaintiffs have satisfied the third prong of the qualified immunity inquiry.

## III. CONCLUSION

We need go no further. For the reasons elucidated above, we dismiss the defendant's appeal in part for want of appellate jurisdiction,[7] and affirm the district court's denial of qualified immunity on the issue that is properly before us. The case is remanded for further proceedings consistent with this opinion. Costs shall be taxed in favor of the plaintiffs.

**So Ordered**.

---

[7] Insofar as we lack jurisdiction to reach a given issue, nothing prevents the defendant from raising that issue at a later stage of this litigation. See, e.g., Behrens, 516 U.S. at 309 (permitting qualified immunity defense to be raised at subsequent stages in the same case, even where it has been previously rejected).

-25-