# United States Court of Appeals
## For the First Circuit

No. 18-1784

TYLER RAYMOND NORTON,

Plaintiff-Appellee,

v.

MICHAEL RODRIGUES, SBCC Deputy Superintendent,

Defendant-Appellant,

OSVALDO VIDAL, SBCC Superintendent; BRIAN MCDONALD, SBCC
Director of Security; STEVEN SILVA, SBCC Director of Operations;
CHRISTOPHER PHELPS, SBCC Lt. Correction Officer of Inner
Perimeter Security; BRIAN WOZNIAK, SBCC Correction Officer of
Inner Perimeter Security; JEFFREY ALTERI, SBCC Sgt. Correction
Officer of Assignments; GREGORY BEDARD, SBCC Lt. Correction
Officer of Discipline; JOHN DOE-1, SBCC employee in charge of
the Department Disciplinary Unit,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Howard, Chief Judge,
Thompson and Barron, Circuit Judges.

Stephen G. Dietrick, Deputy General Counsel, with whom Nancy
Ankers White, Special Assistant Attorney General, and the
Department of Correction Legal Division were on brief, for
appellant.

John McKirachan Pavlos, with whom Law Office of John McKirachan Pavlos were on brief, for appellee.

April 7, 2020

**THOMPSON**, **Circuit Judge**. This case was brought by Tyler Raymond Norton, who was living in a quasi-protective custody unit in Souza Baranowski Correctional Center ("SBCC") in March 2015 when he was jumped by three fellow inmates. Prior to the attack, Norton told SBCC prison officials, including Appellant Michael Rodrigues, that the leader of a notorious prison gang had threatened his life while robbing him at knife point and that, as a result, he feared for his safety. At the summary judgment stage, the district court held that Rodrigues was not entitled to qualified immunity from the instant lawsuit, which alleges that Rodrigues and other SBCC officials (to whom the district court granted immunity and summary judgment) failed to protect Norton from a substantial risk of serious harm in violation of Norton's constitutional rights. Rodrigues challenges that ruling. Because we find that Rodrigues' challenge rests on factual, rather than legal grounds, we dismiss this interlocutory appeal for lack of appellate jurisdiction. See Johnson v. Jones, 515 U.S. 304, 313 (1995) (holding that a district court's denial of summary judgment in a qualified immunity case is not a final, appealable order where, as here, the summary judgment record raises a genuine issue of fact).

## A.   BACKGROUND

Before turning to the jurisdictional framework that is dispositive here, we take a detour to rehearse pertinent facts

- 3 -

from the summary judgment record in the light most favorable to Norton, the nonmovant. See Galloza v. Foy, 389 F.3d 26, 28 (1st Cir. 2004).

At all times relevant to this litigation, Appellant Michael Rodrigues served as the Deputy Superintendent for Classification and Treatment at SBCC, a maximum-security prison in Shirley, Massachusetts that houses approximately 1200 incarcerated men at any given time. From August 2012 to May 2013 and from November 2013 until late August 2015,[1] Appellee Norton resided at SBCC under Rodrigues' care and supervision.

### 1. SBCC's Housing Classification System

As is relevant to Norton's claims and our review of this interlocutory appeal, members of SBCC's incarcerated population are regularly screened for and assigned a "security level," which in turn determines where they can live, work, eat, and exercise within the institution. Security levels (and, by extension, housing, work, and other assignments) are determined by SBCC's classification committee based on certain objective criteria.[2] The

---

[1] Norton did a short stint at MCI-Norfolk between May 15, 2013 and November 15, 2013.

[2] The following information may be used when evaluating an incarcerated person's classification status: disciplinary reports; work and unit evaluations; compliance with assessed need areas; length of time served; escape history (if any); prior history of positive or negative adjustment in maximum, medium, and lower security; degree of responsibility taken for one's actions; nature of the offense and criminal history; the "Objective Point Base Score" ("OBPS") (which is not further defined in SBCC's

- 4 -

committee "consists of [either] one member or [a] three member board," including a chair person, a correction officer, and an assigned correction program officer. Before the committee reaches a classification decision, the incarcerated person at issue is interviewed by the correction program officer assigned to his case. During the interview, he is encouraged to share any pertinent information that might assist with his classification, including health, family, resolved legal issues, program or educational participation, and known enemies. The committee's classification recommendations are subject to review and approval by the Director of Classification (here, Rodrigues). Incarcerated people have the option to appeal their classification.[3]

Based on their classification, SBCC residents are then assigned to one of sixteen housing units. Those units fall into the following five categories:

- General Population - Most of SBCC's incarcerated community reside in "General Population" units, where they can leave

---

booklet); and review of active enemies at the institution and departmentally.

    [3] The record does not provide additional information regarding the procedure for appealing classification decisions, which is distinct from the formal grievance and appeals process that incarcerated people may utilize to challenge other decisions related to their incarceration at SBCC. As a result, we do not know, for example, who is tasked with reviewing an incarcerated person's appeal or what occurs after an appeal is granted or denied.

their cells and travel to work, to the dining hall, and to the gym elsewhere in the facility in accordance with a daily movement schedule.

- Special Housing Unit - The Special Housing Unit is SBCC's protective custody unit, which is a secure location for incarcerated people facing a risk to their health or safety (as determined by prison officials).

- G1 Unit ("G1") - G1 is a 64-cell, quasi-protection housing unit that SBCC describes as "functioning between general population and the Special Housing Unit, SBCC's protective custody unit (SHU)." G1 is reserved for incarcerated people who would have difficulty in General Population for a variety of reasons, including the unpopular nature of the offense that landed them in prison (e.g., sex offenders), "physical weakness," documented conflicts with gang members on the outside or within the facility, drug or other debts, or other safety issues. Individuals housed in G1 are, for the most part, separated from the majority of SBCC's population at meal and recreational time. G1 residents also have the "option" to remain locked in their cells or otherwise limit their range of movement within the Unit. SBCC classification committee members screen incarcerated individuals to determine if G1 is a reasonable alternative to the Special Housing Unit or a prison transfer.

- Health Services Unit - The Health Services Unit provides infirmary care as well as outpatient services. The Unit's staff handle medical screening, physical examinations, lab work, daily sick calls, and emergencies. Incarcerated people must complete a form to request health-care services, except in the case of emergencies.

- Special Management Unit - The Special Management Unit is set apart from the rest of the institution and is used primarily for incarcerated individuals who are awaiting classification (or reclassification) into other units, including "administrative segregation," "protective custody," or "disciplinary detention."

## 2. Norton's Safety Concerns in General Population

When Norton first arrived at SBCC to serve time for armed robbery, he was housed in General Population. While there, on more than one occasion prior to the assault central to Norton's claims, Norton was threatened by other folks incarcerated at SBCC. On May 15, 2013, for example, Norton refused to "lock into his general population cell" due to what SBCC described as "protection issues" with one or more unspecified incarcerated people to whom he allegedly owed money. Over a year later, on December 22, 2014, Norton was robbed at knife point by three documented gang members, including at least one member of the Gangster Disciples (also known as "GD"), which is a subset of the notorious street and prison

gang, Folk Nation.  During the armed robbery, Louis Luiz, one of the SBCC Gangster Disciples' leaders, threatened to kill Norton if he ever told anyone about what happened that day.

As Rodrigues tells it, at some point after being robbed and threatened with a deadly weapon in his cell, Norton "feigned a mental health crisis to get himself pulled out of his housing unit and sent to the Health Services Unit."  (emphasis added). Norton reported the attack to a mental health professional in the Health Services Unit and, later, to Inner Perimeter Security Officer, Bryan Wozniak.  Norton allegedly told Wozniak that he feared for his safety and wanted to be placed in protective custody.[4]  After Norton expressed his safety concern, he was transferred to a temporary protective custody cell in SBCC's Special Management Unit to enable prison officials to determine an appropriate permanent placement for him.

After the attack on December 22, 2014, Norton penned the following letter from his Special Management Unit "To whom it may concern":

> Due to my enemy issues with the Boyos and the Folk/GD (I don't know the difference) [t]here is definitely a major issue with placing me on a unit.  I would like to know if I could be sent back to my County Jail (Plymouth) to finish the rest of my time.  I have no problems with the gangs in my county, and have about 1 year and a half

_____

[4] Wozniak has no memory of Norton requesting protective custody.  Wozniak nonetheless states (and Rodrigues avers in his statement of material facts) that he "never told Norton that he could not be moved [to protective custody]."

> left on my sentence and believe this would be the best
> way to resolve my situation.

The document was date-stamped by SBCC "December 29, 2014," but it's not clear from the record whether that date reflects when Norton actually sent the letter or when prison officials received it. We do know that Norton remained in temporary protective custody from December 22, 2014 until January 5, 2015.

Crucial to our review, Rodrigues acknowledges receipt of this letter and states that he did not receive any other correspondence from Norton after the events of December 22, 2014. Norton's account, of course, is quite different. Norton claims via an affidavit, dated September 9, 2016 and attached to his opposition to defendants' motion to dismiss or (in the alternative) for summary judgment, that he sent "numerous" letters to SBCC officials, including Inner Perimeter Security Officer Christopher Phelps and Brian McDonald (SBCC's Director of Security),[5] regarding his safety concerns while he was in the Special Management Unit. In a supplemental affidavit, dated September 17, 2017 and attached to Norton's opposition to defendants' renewed dispositive motions, Norton asserts that he expressed ongoing safety concerns in "at least five (5) letters" addressed to Rodrigues, the Inner Perimeter

---

[5] Phelps and McDonald are named defendants who were granted qualified immunity by the district court. Norton has not challenged the grant of summary judgment on qualified immunity grounds as to Phelps, McDonald, or the other prison officials named as defendants in this litigation.

Security team, and others after he was transferred from temporary protective custody in the Special Management Unit to G1, a quasi-protective custody unit, on January 5, 2015. Regardless of how many letters Norton sent and when he sent them, we know that he did not receive a response from any SBCC official regarding his safety concerns until January 7, 2015 (i.e., two days after he was transferred from temporary protective custody to quasi-protective custody in G1). Specifically, Rodrigues stated in a letter addressed to Norton (in relevant part): "In reviewing your status in IMS I find that you were moved to the G1 housing unit on 01/05/15. If you encounter safety concerns, notify your Unit Team and or the IPS Department."

As the "sole decisionmaker concerning Norton's G1 placement,"[6] Rodrigues believed that Norton's transfer to G1 would adequately address the "perceived" risk of harm to Norton stemming from the encounter with Gangster Disciples in December 2014. When asked whether he considered the risk of subjecting Norton to gang retaliation by placing him in a quasi-protective custody unit (as opposed to relocating Norton to permanent protective custody in SBCC's Special Housing Unit or transferring Norton to a different

---

[6] Classification recommendations at SBCC during the relevant time were subject to review and approval by Rodrigues in his capacity as SBCC's Director of Classification. As is relevant here, Rodrigues acknowledges that he ordered Norton's transfer from the Special Management Unit to G1.

- 10 -

prison as he had requested in the December 2014 letter), Rodrigues explained that, in his experience, G1 was a safe place for incarcerated people who had issues with SBCC's various prison gangs. In addition, according to Rodrigues, any gang members residing in G1 likely required quasi-protective custody to be safe from their gangs. For this reason, as Rodrigues tells it, gang members in G1 did not tend to be "active" or "affiliated" with their organizations and thus Norton would be safe from gang violence while there.

Around the time Norton was relocated to G1, two documented, but allegedly inactive, members of Gangster Disciples (the organization whose leadership robbed and threatened to kill Norton) were living there. They are identified in the record as Larry Pack and Dana Bain-Simon. Another incarcerated person by the name of Gary Burke, who had no known gang affiliation but had incurred more than one disciplinary report for violence, also lived in G1 at the time of Norton's transfer. Pack, Bain-Simon, and Burke together assaulted Norton on March 21, 2015, placing him in the hospital for nearly ten days. What transpired between Norton and his fellow G1 residents is described in detail below.

### 3. The Assault

On March 21, 2015, at approximately 7:00 pm, Burke called Norton into his cell in G1, where Burke and Pack were hanging out. Immediately prior to the assault, Bain-Simon entered Burke's cell,

- 11 -

blocking the doorway in the process. At some point, according to Norton, Burke punched and kicked him multiple times while Bain-Simon and Pack prevented Norton from leaving Burke's cell. Norton escaped in due course and took off down the hallway, darting into another cell and later walking back out into the hallway, where video footage of the altercation shows that Norton is eventually pursued by Bain-Simon. Bain-Simon (who was later joined by Pack in conducting the assault) caught up with Norton in the hallway, punching and hitting Norton in the head and abdomen several times before guards could intervene. The entire ordeal lasted less than five minutes. But afterwards, Norton was hospitalized for nearly ten days with internal bleeding, a broken nose, and injuries to his intestine. He underwent at least two surgeries as a result.

### 4. The Aftermath

Norton instituted the instant litigation against Rodrigues and other prison officials roughly six months after the assault. The defendants filed for summary judgment, which the court granted as to all SBCC officials except Rodrigues. The district court's pithy two-paragraph order states, in relevant part: "[t]here are material facts in genuine dispute as to key issues in the case, particularly with respect to whether Rodrigues knew of and disregarded a substantial risk of serious harm to Norton from gang retaliation."

Rodrigues filed a timely interlocutory appeal on August 16, 2018, alleging the district court erred because the undisputed material facts indicate that Rodrigues was not deliberately indifferent to a substantial risk of serious harm to Norton and, even if he was, the violation was not at odds with clearly established law. On October 23, 2018, this Court directed Rodrigues to show cause as to why his appeal should not be dismissed for lack of jurisdiction. After considering Rodrigues' response filed on November 6, 2018, this Court allowed the matter to proceed to oral argument, citing Mlodzinski v. Lewis, 648 F.3d 24, 28 (1st Cir. 2011) (exercising interlocutory jurisdiction over district court's rejection of a qualified immunity claim where the defendants "accept[ed] [the] plaintiffs' version [of the facts] in order to test the immunity issue").

## B.  OUR TAKE

That brings us to the present. This Court reviews district court rulings on summary judgment motions de novo. McKenney v. Mangino, 873 F.3d 75, 80 (1st Cir. 2017). However, for the reasons explained below, our authority to review summary judgment orders that do not fully dispose of the case, including the order at issue here, is very limited. Rodrigues nevertheless urges us to consider his interlocutory appeal because (in his view) his arguments are purely legal challenges to the district court's denial of qualified immunity. To help the reader understand why

Rodrigues is wrong, we'll begin by discussing the limited circumstances under which appellate jurisdiction is appropriate in this unique procedural context, and we'll end by explaining why Rodrigues' qualified immunity challenge does not fall within that limited set of circumstances.

### 1. Jurisdictional Framework

"Subject to only a handful of carefully circumscribed exceptions, our appellate jurisdiction is restricted to review of final orders and judgments." Id. (emphasis added). Because an order denying summary judgment allows the litigation to proceed, such orders are not considered final and thus are not typically appealable when first entered. See id. In play here, however, is a potentially applicable exception to that general rule requiring finality before our review. Specifically, this Court has recognized that questions regarding a government official's entitlement to qualified immunity, a doctrine which protects certain government actors from being liable for certain conduct under certain circumstances, ought to be resolved as soon as possible in litigation. Id. (noting that because "qualified immunity consists of both an immunity from suit and an immunity from damages" such claims "ought to be resolved at the earliest practicable time" (citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) and Anderson v. Creighton, 483 U.S. 635, 646 n.6 (1987))); see Ortiz v. Jordan, 562 U.S. 180, 188 (2011) ("Because a plea of

- 14 -

qualified immunity can spare an official not only from liability but from trial, we have recognized a limited exception to the categorization of summary-judgment denials as nonappealable orders." (citing Mitchell, 472 U.S. at 525-26)). Consistent with this principle and notwithstanding the lack of finality, "where, as here, a denial of summary judgment implicates a claim of qualified immunity, the dividing line between appealable and non-appealable denials of summary judgment is blurred." Morse v. Cloutier, 869 F.3d 16, 22 (1st Cir. 2017) (quotations and internal citations omitted).

The crucial distinction between appealable and non-appealable summary judgment orders denying qualified immunity is this: "[p]urely legal rulings implicating qualified immunity are normally reviewable on an interlocutory appeal," id., but rulings "turn[ing] on either an issue of fact or an issue perceived by the trial court to be an issue of fact" are not. Stella v. Kelley, 63 F.3d 71, 74 (1st Cir. 1995) (citing Johnson, 515 U.S. at 318). Therefore, "defendants who invoke our limited power of interlocutory review . . . must be prepared to accept the facts in the light most favorable to the plaintiff and 'develop the argument that, even drawing all the inferences as the district court concluded a jury permissibly could, they are entitled to judgment

as a matter of law.'"[7]  McKenney, 873 F.3d at 81 (quoting Cady v. Walsh, 753 F.3d 348, 359-60 (1st Cir. 2014)).  "In applying these principles, the devil is in the details."  Morse, 869 F.3d at 22.

## 2. Qualified Immunity

With our jurisdictional limitations in mind, we next turn to the qualified immunity standard.  "When a defendant invokes qualified immunity, an inquiring court typically engages in a 'two-step pavane.'"  McKenney, 873 F.3d at 81.  First, "the court must determine whether the plaintiff's version of the facts makes out a violation of a protected right."  Id. (quotations and citations omitted).  Second, the court must determine "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  Id. (quotations and citations omitted).  The second step itself has two sub-parts.  Sub-part one requires the plaintiff to "identify either 'controlling authority' or a 'consensus of cases of pervasive authority' sufficient to signal to a reasonable [official] that particular conduct would violate a constitutional right."  Morse, 869 F.3d at 23 (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999)).  Sub-part two requires us to consider "whether

---

[7] The Supreme Court has carved out a narrow exception to this rule, which requires courts to disregard the nonmovant's version of the facts if that version is "blatantly contradicted by the record, so that no reasonable jury could believe it."  Scott v. Harris, 550 U.S. 372, 380 (2007).  Rodrigues does not argue that this exception applies and, even if he did, he would find no support in the summary judgment record.

a reasonable [official] in the defendant's position would have known that his conduct violated the established rule." Id. "These inquiries are carried out with the understanding that qualified immunity is meant to shield 'all but the plainly incompetent or those who knowingly violate the law.'" McKenney, 873 F.3d at 81 (quoting White v. Pauly, 137 S. Ct. 548, 551 (2017) (per curiam)). We consider here whether the qualified immunity doctrine shields Rodrigues from liability for failing to protect Norton from a serious risk of harm in violation of the Eighth Amendment. Accordingly, the Eighth Amendment provides the legal backdrop for our evaluation of Rodrigues' quest for qualified immunity (here, for example, the operative questions include whether Rodrigues violated a right protected by the Eighth Amendment and whether that right was clearly established at the relevant time).

The Eighth Amendment protects the incarcerated community from "cruel and unusual punishment." U.S. Const. amend. VIII. In so doing, the Amendment imposes a duty on prison officials to "take reasonable measures to guarantee the safety of the inmates." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). Prison officials, therefore, "have a responsibility not to be deliberately indifferent to the risk to prisoners of violence at the hands of other prisoners." Burrell v. Hampshire Cty., 307 F.3d 1, 7 (1st Cir. 2002) (citing Farmer, 511 U.S. at 833 ("Having incarcerated persons with

demonstrated proclivities for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." (quotations omitted))).

Nevertheless, "[n]ot every injury suffered by a prisoner at the hands of another results in constitutional liability on the part of prison officials." Burrell, 307 F.3d at 7-8 (citing Farmer, 511 U.S. at 834). Instead, two requirements must be met for a prison official to have violated an incarcerated person's Eighth Amendment rights in the context of inmate-on-inmate violence. First, an incarcerated person, like Norton, must be "incarcerated under conditions imposing a substantial risk of serious harm," and, second, a prison official, like Rodrigues, must "possess[] a sufficiently culpable state of mind, namely one of 'deliberate indifference' to an inmate's health or safety." Id. at 8.

Demonstrating deliberate indifference requires an additional two-part showing. At the first step, satisfying the "'deliberate' part of 'deliberate indifference' . . . requi[res] that a prison official subjectively 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Id. (quoting Farmer, 511 U.S. at 837); see also Farmer, 511 U.S. at

842 (acknowledging that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that [the risk] was obvious").  At the next step, when considering what constitutes "indifference," this Court has explained that "[p]rison officials cannot be indifferent . . . if they are unaware of the risk" of harm and, if they are aware, they still may not be considered indifferent if "they responded reasonably to the risk" even though harm ultimately was not avoided.  Burrell, 307 F.3d at 8.  In sum, deliberate indifference requires knowledge of a substantial risk of serious harm and an unreasonable response to the same.

### 3.  Application

Having erected the jurisdictional framework and summarized the two-part test for qualified immunity (and its many relevant subparts), we make our way back to Norton's claims and Rodrigues' assertion that he is immune from them.  Here, Norton alleges that Rodrigues, by placing him in G1 and failing to keep him safe from G1's residents, violated his clearly established Eighth Amendment rights and is therefore liable under 42 U.S.C. § 1983.  Rodrigues, in turn, contends that he is immune from Norton's Section 1983 claims because he reasonably understood that his decision to house Norton in G1 eliminated any substantial risk of serious harm to Norton and adequately addressed Norton's perceived risk of harm based on the information available to

Rodrigues at the time. In denying Rodrigues' motion for summary judgment, the district court concluded there were genuine disputes of material fact as to "whether Rodrigues knew of and disregarded a substantial risk of serious harm to Norton from gang retaliation." Norton v. Rodrigues, No. 15-cv-13216-GAO (D. Mass. July 13, 2018). Accordingly, to determine whether Rodrigues may have violated a clearly-established right and therefore may not be entitled to qualified immunity, we focus on the portions of the record that could reasonably be read to support the conclusion that Rodrigues knew about Norton's safety concerns but failed to take reasonable steps to address them.

Taking the facts in the light favorable to Norton, it is undisputed that in making the decision to transfer Norton to G1 instead of to protective custody or another prison, Rodrigues knew about Norton's run-in with the Gangster Disciples while living in General Population in December 2014; Rodrigues understood from his years of experience as a prison official that the Gangster Disciples are a violent prison gang known for targeting other incarcerated people; and he also knew that Norton asked via letter, date-stamped December 29, 2014, to be transferred out of SBCC because of his issues with the Gangster Disciples.

From Rodrigues' vantage, these facts, at most, indicate that there was a serious risk of substantial harm to Norton in General Population and that he took reasonable steps to address

that harm by transferring Norton to G1's quasi-protective custody. Continuing, Rodrigues says that G1 was a reasonable alternative to permanent protective custody or a prison transfer even though known members of Gangster Disciples were living in G1 because, among other things, these members were "inactive." At bottom, Rodrigues insists he was unaware of any additional information from Norton or anyone else from which he could have reasonably concluded that the decision to house Norton in G1 was "unsound." In support of this conclusion, Rodrigues tells us it is "undisputed" that Norton "submitted no correspondence that Rodrigues ever received, saw, or became aware of, challenging his placement in G1 or identifying an inmate in G1 as an enemy of conflict."

But here's the rub: Rodrigues' characterization of the facts regarding what he did and didn't know about Norton's safety concerns as to G1 directly conflicts with Norton's take. As mentioned earlier, the parties dispute whether Norton circulated and Rodrigues (or a subordinate) received other correspondence, including correspondence post-dating Norton's December 2014 letter written from temporary protective custody. Crucially, Norton, who at this stage enjoys the benefit of having the facts viewed in the light most favorable to his claims, contends that he sent at least five letters to Rodrigues and prison officials under Rodrigues' authority after he was transferred to G1. Whether Rodrigues (as the Deputy Superintendent for Classification and Treatment at

SBCC) or a subordinate knew of these purported letters and whether Rodrigues knew the content of these letters[8] would be directly relevant to the jury's consideration of the reasonableness of Rodrigues' decision to transfer and keep Norton in G1 despite the documented gang presence there. Rodrigues' account also collides head-on with the district court's account of the facts, which led the district court to conclude that there are genuine disputes as to what Rodrigues did or did not know about the risk of harm to Norton in the form of gang retaliation. In particular, Rodrigues' account depends on us accepting that the known gang members housed in G1 did not pose a risk because they were inactive. But the district court did not view as settled the question of whether gang members residing in G1 were inactive.

Where, as here, the interlocutory challenge to a ruling denying qualified immunity invites us to "choos[e] among conflicting facts," Bergeron v. Cabral, 560 F.3d 1, 5 (1st Cir. 2009), abrogated on other grounds by Reyes-Orta v. P.R. Hwy. and Transp. Authority, 811 F.3d 67 (1st Cir. 2016), or "to adopt a spin on the summary judgment record different from that taken by

_____

    [8] Norton claims that in these letters he raised his ongoing concern about the Gangster Disciples, including while he was incarcerated in G1 along with its so-called inactive membership. These letters are not in the record. However, since Rodrigues has not challenged the admissibility of Norton's sworn statements regarding the existence of these letters or their content, we need not opine on the issue today.

the district court," McKenney, 873 F.3d at 84, we lack jurisdiction to accept the invitation. See Cady, 753 F.3d at 361 (declining to exercise jurisdiction over interlocutory appeal concerning denial of qualified immunity where, as here, "the defendants brief so clearly does not 'accept[] as true all facts and inferences proffered' by the plaintiff" (alteration in original) (quoting Mlodzinski, 648 F.3d at 28)); see also Ortiz, 562 U.S. at 190-91 (holding that the qualified immunity defense asserted was not reviewable on interlocutory appeal because it did not present "neat abstract issues of law" (quoting Johnson, 515 U.S. at 317)). Because Rodrigues fails to pose the qualified immunity question "in a manner that would permit us to conclude that 'the answer to it does not depend on whose account of the facts is correct' . . . we lack the authority to provide an answer." Cady, 753 F.3d at 361 (quoting Stella, 63 F.3d at 75). We therefore conclude that Rodrigues' discontentment with the district court is not reviewable by this Court at this juncture.

## C. WRAP UP

Given our lack of jurisdiction over the instant interlocutory appeal, we remand this matter back into the capable hands of the district court.

Costs awarded to Norton.