**Michael LEACH, Plaintiff**

v.

**Jenny HEYMAN, et al., Defendant**

No. 3:02CV7133.

United States District Court,
N.D. Ohio,
Western Division.

Nov. 21, 2002.

---

Connie F. Zemmelman, Harland M. Britz, Britz & Zemmelman, TYoledo, OH, for Plaintiff.

Margaret J. Lockhart, Cooper & Walinski, Toledo, OH, for Defendant.

## ORDER

CARR, District Judge.

This is a civil rights case arising from an altercation between the plaintiff, Michael Leach, who is an African–American, and Jenny Heyman, a former employee at a convenience store operated in Clyde, Ohio, by the defendant Speedway Super America (Speedway). Heyman is in default. Speedway has filed a motion for summary judgment, which shall be granted in part and denied in part.

Plaintiff works as a conductor for the Norfolk Southern Railroad. He and his co-workers routinely travel between Toledo and Bellevue, Ohio, to meet trains to which they have been assigned. En route they sometimes stop at the Speedway store in Clyde.

Plaintiff, a co-worker, Ray Alexander, who is also African–American, and their driver, Raymond James Bohrer, stopped at the defendant's Clyde store shortly before midnight on March 12, 2001. Defendant Heyman was the sole employee in the store, and was at the cash register. She was on the telephone when plaintiff and his companions entered.

Alexander selected some items and paid for them without incident, though Heyman remained on the phone throughout his transaction.

In the meantime, plaintiff had selected his items and went to pay for them. He asked Heyman, who was still on the phone, if the station carried a particular brand of cigarettes. She looked irritated by his question, but looked for the cigarettes. Plaintiff asked about the price for the cigarettes; Heyman, stating something like, "how should I know?", put down the phone, checked the price, and told plaintiff what the cigarettes cost.

Plaintiff asked Heyman what her problem was. She replied, "I don't have a problem." Plaintiff then asked for a different, less expensive brand of cigarettes, which Heyman gave to him. Plaintiff paid for his purchases. Heyman threw his change on the counter. Plaintiff stated that if she got off the phone she might be able to do her job or handle her customers better. Heyman look at him as if she didn't care what he thought, and threw up her hand in a dismissive way.

As he turned to leave, plaintiff said, under his breath, "Cunt." There is no direct evidence that Heyman heard that epithet. Bohrer, who was standing near both plaintiff and Heyman, testified that, though he heard shouting, he didn't hear any names being uttered by either Heyman or plaintiff. But Heyman apparently believed that plaintiff had said something offensive, because she became agitated, asked plaintiff what he had said, stated she was not a whore, called plaintiff a "Nigger," and said she was going to kick his ass.

Plaintiff stopped by the door, and looked at Heyman. She jumped across the counter, grabbed him, and tried to push him out the door. Plaintiff held up his hands, in one of which he was carrying coffee.

Heyman slapped him on the side of his face.

The police were called. Heyman was charged with assault and later plead guilty to a lesser offense. Speedway fired her the day after the encounter.

Plaintiff claims that Heyman's treatment of him was due to his race, and that Heyman violated his rights under the federal, 42 U.S.C. § 2000a(3), and state public accommodation statutes, § 4112.02(G), and §§ 1981 and 1982 of the Civil Rights Acts, 42 U.S.C. §§ 1981, 1982. His complaint also includes a state tort claim for assault. Speedway seeks summary judgment as to all claims.

### A. § 1981

Section 1981, which applies to both public and private sector actors, guarantees that all persons have the same right to "make and enforce contracts," and bars intentional discrimination on the basis of race. In *Christian v. Wal–Mart Stores, Inc.*, 252 F.3d 862, 872 (6th Cir.2001), the Sixth Circuit recently defined the elements of proof of a § 1981 claim in the context of commercial establishments, such as defendant Speedway's store, as requiring a showing that plaintiff:

1) is a member of a protected class;

2) sought to make or enforce a contract for services ordinarily provided by the defendant; and

3) was denied the right to enter into or enjoy the benefits or privileges of the contractual relationship in that a) plaintiff was deprived of services while similarly situated persons outside the protected class were not and/or b) plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory.

▆ The court adopted the third prong of this standard—requiring a showing of "markedly hostile" and "objectively discriminatory" conduct—to "account for

situations in the commercial establishment context in which plaintiff cannot identify other similarly situated persons." *Id.* at 871. Speedway argues that proof without a showing of differential treatment of others is limited to circumstances involving a complete refusal to serve members of a protected group. Such limitation is not expressly stated in *Christian*, and, in any event, would make no sense. Racial animus can offend a customer equally whether he gets no service at all or is served in a manner that marks him with the badge of slavery that the Civil Rights Acts were enacted to remove.

Speedway claims that plaintiff cannot show that the manner in which Heyman waited on and otherwise treated him could be found by a jury to have been "markedly hostile" due to his race and objectively discriminatory. Defendant points out that Alexander made his purchases without incident, Heyman's outburst, name-calling, and assault were provoked by plaintiff's own actions, and Heyman's conduct occurred after plaintiff had completed his purchase and was leaving the store.

To be sure, nothing disruptive transpired while Alexander was making his purchases. Heyman, did, however, manifest an inattentive and indifferent attitude towards Alexander by remaining on the phone throughout her transaction with him. Doing so, she set the stage for plaintiff's protests about her attitude and treatment of him. All that we know from Alexander's experience is that Heyman was not willing to extend common courtesy and appropriate service to him. If not overtly hostile towards Alexander, Heyman was certainly not attentive and cordial.

With regard to defendant's contention that Heyman's actions were provoked by defendant's own unpardonable use of a vulgarity that reasonably could be viewed as offensive to a woman as the racial epi-

thet used by Heyman, a jury could find that Heyman did not hear what plaintiff said. It could, as well, find that Heyman's actions far exceeded anything she heard or observed plaintiff doing.

With regard to Speedway's contention that plaintiff cannot recover under § 1981 because plaintiff had completed his purchase and was exiting before the discriminatory conduct occurred, a jury could find that Heyman's treatment of plaintiff was continuous, and manifested animus during the entire period that he was in the store. The facts of this case differ, therefore, from those in *Rogers v. Elliott,* 135 F.Supp.2d 1312, 1313 (N.D.Ga.2001), in which the plaintiff had paid for her purchases without incident, and only afterwards was one of her children accused of stealing some candy.

Speedway also contends that Heyman's treatment of him was not "markedly hostile" such that a reasonable person would view as objectively discriminatory, or based on his race. According to Speedway, the circumstances of this case are similar to those in *Lizardo v. Denny's, Inc.,* 270 F.3d 94 (2nd Cir.2001), in which plaintiff claimed that he had been refused service on the basis of his race. He had been part of a group of eight minority individuals who had entered the defendant's restaurant and complained about a delay in being seated, asserting that the delay was based on their race. The hostess told him, "don't even go there," and had him escorted out of the restaurant to the parking lot, where a brawl ensued. According to the defendant, plaintiff and others in his group were inebriated, profane, loud, and disruptive.

Noting that it could "envision many circumstances where markedly hostile treatment, even in a purportedly service-oriented industry, would raise no inference of racial animus, but rather it would simply be yet another example of the decline of civility," the court in *Lizardo* stated:

the cited instances of hostility, considered in context, did little to support an inference of discriminatory intent. A failure to greet customers on an extremely busy evening and an exasperated—even testy—response to a complaint of discrimination do not constitute marked hostility as defined, nor are they conduct which should be presumed to have its origins in racial bias. Having been directed to remove Lizardo, the subsequent shoving of Lizardo and Dugan by the security officers in the heated exchange of words does suggest anger, but there is nothing to suggest that the anger stemmed from a bias against people of Lizardo's race.

*Id.* at 102.

Heyman's response to plaintiff's objection to how he was being treated (i.e., his asking her if she had a problem), was far more aggravated and indicative of racial animus than the action of escorting an inebriated patron outside, as occurred in *Lizardo.* In that case the restaurant's reaction was not accompanied, as it was here, by a racial epithet. This is more than the rude, indifferent, or unfriendly circumstances that have been encountered by other § 1981 plaintiffs. *See Callwood v. Dave & Buster's, Inc.,* 98 F.Supp.2d 694, 706 (D.Md.2000) (noting that everyone has unpleasant experiences in restaurants, and that the day of "the customer is always right" is long past); *Bobbitt by Bobbitt v. Rage Inc.,* 19 F.Supp.2d 512, 514 (W.D.N.C., 1998) (service provided to plaintiffs differed in promptness and attentiveness from that given to white patrons; one group was required to prepay for its food because three Black teenagers had left on the day before without paying); *Robertson v. Burger King, Inc.,* 848

F.Supp. 78, 81 (E.D.La.1994) (slow service not indicative of animus).

I am persuaded that a jury could find that Heyman's conduct throughout the course of her dealing with plaintiff was indicative of racial animus, even though that motivation may have overtly manifested itself only when Heyman came after plaintiff as he was leaving the store. Though she only called plaintiff a name that any African-American would find deeply offensive after he had completed his purchases and was about to exit, that she did so at all is clear and direct proof of bias. It also indicates that the "service" she provided was less than that which she might have provided, had plaintiff been Caucasian.

I conclude, accordingly, that Speedway's motion for summary judgment must be denied with regard to plaintiff's claim under § 1981.

### B.  § 1982

Section 1982 provides that all citizens "shall have the same right,...to...purchase...personal property" as white persons. This provision was enacted to enable all persons to acquire and hold property equally, and without regard to their race. *United States v. Brown*, 49 F.3d 1162, 1168 (6th Cir.1995).

This statute is most frequently applied in the fair housing context. The elements of a § 1982 claim in that context are that: 1) plaintiff is a member of a racial minority; 2) plaintiff applied for and was qualified to rent or purchase certain property; 3) he or she was rejected; and 4) the property remained available thereafter. *Selden Apartments v. U.S. Dept. of Housing and Urban Development*, 785 F.2d 152, 159 (6th Cir.(1986). Applied in the context of a purchase of personal property, the elements would appear to be: 1) plaintiff is a member of a racial minority; 2) he sought to purchase personal property; 3) he was unable to purchase the property; and 4) the property remained available for sale to others.

■ I conclude that plaintiff cannot make out a claim under § 1982, because he was, regardless of Heyman's racial animus, able to purchase the items that he had selected. Nothing that he wanted to buy was withheld from him, or only made available to him on terms and conditions that differed from the terms and conditions pursuant to which it was available to others. Heyman's animus may have affected how the transaction was conducted, but it did not affect its outcome. Thus, plaintiff cannot prevail, and Speedway's motion for summary judgment must be granted with regard to plaintiff's claim under § 1982.

### C.  Public Accommodation Claims

Plaintiff asserts claims under the federal, 42 U.S.C. § 2000a(3), and state public accommodations statutes. O.R.C. § 4112.02(G). He acknowledges that he has not exhausted his administrative remedies under the federal statute, and concurs in the grant of summary judgment in Speedway's favor as to that claim.

■ Section 4112.02(G) provides prohibits denial "to any person, except for reasons applicable to all persons regardless of race, ..., [of] the full enjoyment of the accommodations, advantages, facilities or privileges of the place of public accommodation." Under this provision, "the test is simply whether the proprietor, keeper, manager or employee of a place of public accommodation has denied to any person the full enjoyment of such place for reasons not applicable alike to all persons, irrespective of race, color, religion, national origin or ancestry." *Ohio Civil Rights Commission v. Lysyj*, 38 Ohio St.2d 217, 221, 313 N.E.2d 3 (1974). This requires that plaintiff have had "access to the services and products of [Speedway's store] in the same manner as all other customers."

*Meyers v. Hot Bagels Factory, Inc.*, 131 Ohio App.3d 82, 721 N.E.2d 1068, (1999). Where such has occurred, plaintiff cannot prevail. In that case, because the court found that the plaintiff had been served with what she had ordered, she had no claim under Ohio's public accommodation statute for vulgar gender-oriented statements made to her by the defendant restaurant's manger.

■ Here, however, for the same reasons expressed with regard to plaintiff's § 1981 claim, I conclude that a jury could find that he had not received "full enjoyment" of the "services and products" of Speedway's Clyde convenience store. Serving plaintiff in a manner that could have been found to have been offensive, hostile, and, ultimately physically assaultive is not, a jury could find, to extend the same treatment to the plaintiff as others not of his race could be expected to enjoy.

I conclude, accordingly, that Speedway's motion for summary judgment on plaintiff's state public accommodation claim should be overruled.

### D. Assault Claim

■ Speedway seeks summary judgment on plaintiff's assault claim on the basis that an employee who insults and assaults its customers is acting outside the scope of her employment.

■ An employer can be held liable for an employee's intentional, malicious acts only where those acts are performed in the scope of the employee's employment. *See, e.g., Wiebold Studio, Inc. v. Old World Restorations, Inc.* 19 Ohio App.3d 246, 250, 484 N.E.2d 280 (1985). As a general rule, however, " 'an intentional and wilful attack committed by an agent or employee, to vent his own spleen or malevolence against the injured person, is a clear departure from his employment and his principal or employer is not responsible therefore.' " *Schulman v. Cleveland*, 30 Ohio St.2d 196,

198, 283 N.E.2d 175 (1972) (quoting *Little Miami Railroad Co. v. Wetmore*, 19 Ohio St. 110, 132 (1869)). *Accord, Vrabel v. Acri*, 156 Ohio St. 467, 474, 103 N.E.2d 564 (1952).

■ Plaintiff claims that Heyman was acting within the scope of her employment, which included not just waiting on customers, but also maintaining order. An employee's physical contact with or restraint of an unruly customer, undertaken in an effort to calm the customer and maintain or restore order, could be within the scope of the employee's employment. *See Sims v. Bergamo*, 3 N.Y.2d 531, 169 N.Y.S.2d 449, 450–451, 147 N.E.2d 1, 2–3 (assault of unruly patron by bartender to protect employer's property and to maintain order on premises); *Duff v. Corn*, 84 Ohio App. 403, 412–13, 87 N.E.2d 731 (1947) (deputy sheriff employed to keep order in a nightclub could be found to be acting within scope of such employment, rather than as a public officer, when he a patron who had been creating a disturbance). Here, however, the only disturbance was that which was being created by Heyman. Likewise, the only danger to good order was that which she created when she jumped over the counter and assaulted the plaintiff as he was about to leave the store.

As in *Fisher v. Hering*, 88 Ohio App. 107, 112, 97 N.E.2d 553 (1948), where a waitress struck a patron who accused her of short-changing him, and *Cox v. McLima Management, Inc.*, 1992 WL 209300, *2 (Ohio App. 3 Dist., Allen County, Aug 27, 1992), where a waitress followed a patron to a parking lot and struck her, Heyman "simply lost [her] temper, for whatever reason, and for the period of the assault acted solely out of personal enragement and malice against the [plaintiff] and outside the scope of [her] arguable employment" with Speedway. *Finley v. Schuett,*

8 Ohio App.3d 38, 40, 455 N.E.2d 1324 (1982).

I conclude, accordingly, that the jury could not find that Heyman was acting within the scope of her duties when she assaulted the plaintiff. Speedway is therefore, entitled to summary judgment on plaintiff's assault claim against it.

### Conclusion

For the foregoing reasons, it is

ORDERED THAT the defendant Speedway's motion for summary judgment be, and the same hereby is granted with regard to plaintiff's § 1982, federal public accommodation, and state assault claims, and said motion be, and the same hereby is denied with regard to plaintiff's claims under § 1981 and Ohio's public accommodation statute.

Scheduling conference is set for November 26, 2002, at 10:30 a.m.

So ordered.