# United States Court of Appeals
## For the First Circuit

No. 13-1469

CHENELL HAMMOND,

Plaintiff, Appellant,

v.

KMART CORPORATION and SEARS HOLDINGS CORPORATION,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lynch, Chief Judge,
Thompson and Kayatta, Circuit Judges.

Christopher J. Trombetta for appellant.
William F. Benson, with whom Christine M. Netski and Sugarman,
Rogers, Barshak & Cohen, P.C. were on brief, for appellees.

October 25, 2013

**LYNCH, <u>Chief Judge</u>**.  Chenell Hammond, a retail customer, appeals from the dismissal of her action under 42 U.S.C. § 1981 against Kmart Corporation and Sears Holdings Corporation (collectively, "Kmart"), where she successfully purchased goods using the store's layaway process.  The district court granted Kmart's motion to dismiss because Hammond's pleadings were insufficient to state a claim under § 1981.  It dismissed the federal claim, but dismissed without prejudice a pendent state law claim.  We affirm on the narrow facts of this case and the paucity of the allegations.

I.

Hammond filed suit on January 14, 2013, bringing a federal claim of racial discrimination under 42 U.S.C. § 1981 and a pendent state law claim of negligent infliction of emotional distress.  We take all of Hammond's factual allegations as true, drawing reasonable inferences in her favor, <u>Lemelson</u> v. <u>U.S. Bank Nat'l Ass'n</u>, 721 F.3d 18, 21 (1st Cir. 2013), as did the district court.

Hammond is an African-American woman.  In her complaint, she alleged that on November 21, 2012, a white Kmart sales clerk said "insulting racial slurs and comments" to her while she was placing items on hold in a layaway transaction.

More specifically, on that day Hammond was at Kmart with her two children.  In order to place several items on layaway, she

needed to give the sales clerk her identification card, which indicated that she lived in Roxbury, Massachusetts, a part of Boston which has a high percentage of African-American residents.[1]

Upon receiving this identification card, the white sales clerk asked if Hammond would be "jumping the counter" to get what she needed because she is from Roxbury. The clerk also labeled the identification card, which was not a driver's license, a "liquor ID."

The clerk commented that she used to live in Dorchester, which is adjacent to Roxbury, but had to move because of "porch monkeys" in that area. She said that these "porch monkeys" had fired gunshots through her window, causing her to dive under her bed for protection.

The clerk next spoke to Hammond about a public housing project in Weymouth, Massachusetts, assuming that Hammond was familiar with it, although she was not. Specifically, the clerk said that she lived in Weymouth and that the only "action" in her neighborhood came from that project.

Hammond was "humiliated and deeply offended" by these comments, which she believed reflected the sales clerk's belief

---

[1] In a layaway transaction a retailer agrees to hold merchandise, which a customer secures by making a deposit. The customer can retain the merchandise once the price is paid in full. See Black's Law Dictionary 968 (9th ed. 2009).

that she was "poor, inferior and violent . . . because she is African American."  She alleged no other consequences.

The complaint did not allege that Kmart in any way failed to go through with the layaway, refused to perform any transactions with her, or otherwise refused to contract with her.  Nor did it allege that Hammond had complained to the store, and, if so, what had happened in response.

Kmart moved to dismiss the § 1981 claim, stating that the complaint's allegations regarding the sales clerk's racially discriminatory remarks fail to state a claim under § 1981.  It argued that Hammond's failure to allege that Kmart interfered with a contractual relationship or denied her any rights under the layaway contract warranted dismissal of her § 1981 claim.

Hammond opposed this motion but did not seek to amend her complaint.  Rather, her opposing memorandum added that the Kmart clerk's remarks "almost did cause the cessation of the [layaway] transaction" because Hammond was so offended by them that she "considered walking away from the [checkout] counter."

The district court, following Garrett v. Tandy Corp., 295 F.3d 94 (1st Cir. 2002), dismissed Hammond's § 1981 claim.  It reasoned that Hammond "fail[ed] to make any factual averments to support a claim that the store clerk's comments, described as 'racially demeaning, insulting, rude, and discriminatory,'" precluded her from making or enforcing her layaway contract with

-4-

Kmart. It held that Hammond's additional assertion that she "almost" did not complete the layaway payment was also inadequate to state a claim.

Hammond appeals from the dismissal of her § 1981 claim.

## II.

We review de novo an order of dismissal for failure to state a claim. Lemelson, 721 F.3d at 21. Dismissal is appropriate "if the complaint does not set forth 'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'" Id. (quoting United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 384 (1st Cir. 2011)). So, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Id. (alteration in original) (quoting Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)) (internal quotation marks omitted).

## III.

The text of 42 U.S.C. § 1981 provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens. . . ." Interpretation of this language has been the subject of a number of Supreme Court cases. See Domino's Pizza, Inc. v. McDonald, 546

U.S. 470 (2006); Rivers v. Roadway Express, Inc., 511 U.S. 298 (1994); Runyon v. McCrary, 427 U.S. 160 (1976). This court also has a series of § 1981 cases. See Garrett, 295 F.3d 94; Danco, Inc. v. Wal-Mart Stores, Inc., 178 F.3d 8 (1st Cir. 1999); Benjamin v. Aroostook Med. Ctr., Inc., 57 F.3d 101 (1st Cir. 1995).

To state a claim under § 1981, a plaintiff must show that (1) she is a member of a racial minority; (2) the defendant discriminated against her on the basis of her race; and (3) the discrimination implicated one or more of the activities listed in the statute, including the right to make and enforce contracts. Garrett, 295 F.3d at 98.

It is undisputed that Hammond, an African American, is a member of a racial minority. In addition, Kmart for present purposes does not contest that a jury could find that the sales clerk's remarks, as alleged in the complaint, were racially discriminatory. The question is whether Hammond's complaint sufficiently met the third requirement. Under Garrett, "to satisfy the foundational pleading requirement for a [§ 1981] suit . . ., a retail customer must allege that he was actually denied the ability either to make, perform, enforce, modify, or terminate a contract, or to enjoy the fruits of a contractual relationship, by reason of a race-based animus." Id. at 100-01 (emphasis added).

The scope of § 1981's coverage has changed over time. In 1991 Congress amended § 1981 to overrule Patterson v. McLean Credit

-6-

Union, 491 U.S. 164 (1989), which had narrowly interpreted the statute's phrase "make and enforce contracts." H.R. Rep. No. 102-40, pt. 2, at 694-95 (1991). Patterson had held that the statutory phrase did not encompass on-the-job racial harassment experienced by an African-American employee who claimed she was ultimately fired because of her race. 491 U.S. at 171. The Court determined that "conduct by the employer after the contract relation has been established, including breach of the terms of the contract" comprises the "performance" of a contract, not its making or enforcement. Id. at 177.

The 1991 amendment sought to undo this holding by more broadly defining the phrase "make and enforce contracts" to include "the making, performance, modification, and termination of contracts," as well as "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Even with this broader definition, however, Congress's focus on "bar[ring] all racial discrimination in contracts" did not change. H.R. Rep. No. 102-40, pt. 2, at 731 (emphasis added); see also Rivers, 511 U.S. at 306 n.6; Garrett, 295 F.3d at 100.

As the Supreme Court more recently said in Domino's Pizza: "[N]othing in the text of § 1981 suggests that it was meant to provide an omnibus remedy for all racial injustice. If so, it would not have been limited to situations involving contracts." 546 U.S. at 479. As a result, courts interpreting the 1991

amendment, including this court in <u>Garrett</u>, have continued to require a "sufficient nexus between the asserted discrimination and some contractual right or relationship." <u>Garrett</u>, 295 F.3d at 98.

Our case law and Supreme Court precedent control the outcome here. In <u>Garrett</u>, we affirmed a district court's dismissal of a § 1981 claim by a retail customer of the defendant store for failure to state a claim. 295 F.3d at 106. There, as in this case, the plaintiff alleged that racial discrimination interfered with his § 1981 right to make and enforce contracts in a retail store, although he had completed his purchase.

Garrett, an African-American man, claimed he endured two forms of racial discrimination related to his shopping at Radio Shack. The first is that three white employees monitored his movements throughout the store, and "at least one of them accompanied him throughout his visit." <u>Id.</u> at 96.

Although Radio Shack did not carry a police scanner that Garrett was looking for, he ended up buying a book, a phone, and some batteries. <u>Id.</u> This court held that Garrett's allegations of race-motivated surveillance did not state a § 1981 claim because the monitoring by the three employees did not impair his ability to make purchases. <u>Id.</u> at 101.

There was a second form of alleged discrimination. Garrett also alleged that shortly after he had completed his purchase and had left Radio Shack, a store employee noticed a

laptop was missing and called the police to say that he suspected Garrett of the theft, giving them Garrett's home address which he had secured from Garrett at the checkout counter.  Id. at 96. Although three or four white customers had been in Radio Shack at about the same time as Garrett, only Garret was named as a suspect to the police.  As a result, an officer went to Garrett's home. Garrett gave the officer permission to search his home and car; no laptop was found.  Id. at 96-97.

Despite the extent of this post-purchase intrusion, the Garrett court held that the allegations did not state a § 1981 claim because Garrett had "fully consummated the contract while he was in the store (i.e., he completed the purchase of a book, a telephone, and some batteries) and thereafter retained the items that he acquired."  Id. at 101.

The Garrett holding reflects an important limit on § 1981 claims: the alleged discrimination must interfere in some way with the "make and enforce" contractual interests described in the statute.  See id. at 102.  The Supreme Court, since Garrett, has reinforced this limit, saying that "[s]ection 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship."  Domino's Pizza, 546 U.S. at 476.

Thus, to state a claim a plaintiff must "initially identify an _impaired_ 'contractual relationship,' § 1981(b), under which the plaintiff has rights." Id. (emphasis added). Absent this requirement, § 1981 would become a catch-all remedy to racial discrimination, "produc[ing] satellite . . . litigation of immense scope." Id. at 479. As the Eighth Circuit has stated, "[s]ection 1981 'does not provide a general cause of action for race discrimination.'" Green v. Dillard's, Inc., 483 F.3d 533, 538 (8th Cir. 2007) (quoting Youngblood v. Hy-Vee Food Stores, Inc., 266 F.3d 851, 855 (8th Cir. 2001)).

Here, Hammond's pleadings describe comments, alleged to have been fueled by racial animus, that "humiliated and deeply offended" her. They do not allege that Hammond was unable to complete her layaway transaction; nor do they say that the Kmart sales clerk refused to help Hammond, forced Hammond to use something other than the normal layaway procedure, or otherwise contracted with Hammond on different terms than other customers, such as charging her a higher price. There is no claim that Hammond did not receive the purchases she had placed on layaway.

Hammond's scant allegations provide no basis for inferring those comments interfered with her ability to buy items through layaway.[2] See Withers v. Dick's Sporting Goods, Inc., 636

---

[2] Nothing in the record suggests that there are other material facts that Hammond failed to allege.

-10-

F.3d 958, 965 (8th Cir. 2011) ("[M]ere offending conduct[] does not demonstrate interference with a protected activity[,] and any allegations of such [conduct] are insufficient to state a claim under § 1981."). Just as the <u>Garrett</u> court dismissed a § 1981 claim because the plaintiff did not allege that the "challenged surveillance . . . ha[d] some negative effect on [his] ability to contract with the store," 295 F.3d at 101, Hammond's complaint also lacks in this way.[3]

If anything, <u>Garrett</u> was a closer case than this. Unlike Garrett's one-time successful purchase of goods at Radio Shack, in layaway transactions customers typically make payments in installments while an item is on hold. Despite the greater opportunity for contractual interference given the structure of Hammond's purchase, Hammond does not allege that this or any other Kmart employee impeded her from making installment payments or from taking home the items placed on layaway. She was not hindered from making and completing a layaway purchase.

Importantly, Kmart's motion to dismiss put Hammond on notice that her pleadings were insufficient, but Hammond did not

---

[3] While Hammond does not state a federal claim, this is not to say that she has no claim under state law. Hammond's claim of negligent infliction of emotional distress, which the district court dismissed without prejudice, can be pursued in state court. <u>See also</u> Mass. Gen. Laws Ch. 272 § 98 (prohibiting the "distinction, discrimination, or restriction on account of race . . . relative to the admission of any person to, or his treatment in any place of public accommodation").

seek to amend the complaint. Her opposing brief added only the additional allegation that she did, in fact, complete the layaway purchase. However, a plaintiff "must allege the actual loss of a contract interest," not a "theoretical loss." Garrett, 295 F.3d at 102; see also Morris v. Dillard Dept. Stores, Inc., 277 F.3d 743, 751 (5th Cir. 2001) ("[A] plaintiff must establish the loss of an actual, not speculative . . . contract interest.").

Finding no room under Garrett, Hammond points to Sawyer v. Southwest Airlines Co., 243 F. Supp. 2d 1257 (D. Kan. 2003), a district court decision from another jurisdiction addressing a different problem. There the court held that a jury could find that a flight attendant's racist joke over an aircraft intercom deprived a minority customer of the "the enjoyment of all benefits, privileges, terms, and conditions" of his contract with the airline. 243 F. Supp. 2d at 1273 (quoting 42 U.S.C. § 1981(b)) (internal quotation marks omitted). The court reasoned that an airline passenger reasonably expects that cordial service during a flight is a benefit or term of the contract for transportation. See id. at 1272-73 (comparing contract with airline to a contract with a restaurant, where the experience purchased reasonably includes service in addition to the food that is consumed).

Hammond suggests that the layaway transaction here is more similar to the "continuing contractual relationship" of a flight than to a discrete retail transaction. However, the object

-12-

of the typical retail transaction, purchasing goods, is not transformed merely because a customer is allowed to pay for those goods over time in installments. Moreover, at oral argument Hammond's counsel was unable to articulate any benefit, privilege or term of her contractual relationship with Kmart that she was denied akin to the in-flight service at issue in Sawyer.[4]

Hammond cannot point to any case where verbal comments alone made out a § 1981 claim against a retail store.[5] In short, Hammond's sparse allegations are that the only harm she suffered was from the sales clerk's utterances, without more. She needs more, but there is no more here. There are no allegations that could plausibly support a finding that this completed layaway transaction involving solely a sale of goods was a violation of § 1981. These line-drawing tasks, which have fallen to the Courts of Appeals, are needed to effectuate Congressional intent.

---

[4] At oral argument Hammond's counsel suggested a comparative theory, stating that Hammond was unable to make a contract "in the same manner" as whites because she was subjected to racial slurs. This legal theory presumes that white people are not also exposed to insensitive remarks by this Kmart sales clerk, but Hammond has made no allegations to support this assumption. More importantly, this theory does not distinguish Garrett.

[5] Hammond mischaracterizes the holding in Leach v. Heyman, 233 F. Supp. 2d 906 (N.D. Ohio 2002), claiming that the Leach court held that a convenience-store clerk's utterance of a racial slur violated § 1981. However, that court found only that the "racial epithet" was evidence of racial bias sufficient to survive summary judgment. 233 F. Supp. 2d at 910-11. Moreover, the conduct alleged in that case went far beyond oral remarks; the sales clerk was charged with assault for pushing and slapping the black customer. Id. at 908-09.

In our view, Garrett is more generous in its criteria for an adequate § 1981 claim than the rule adopted in some other circuits.[6]  See Lopez v. Target Corp., 676 F.3d 1230, 1234-35 (11th Cir. 2012) (ruling that a retail store must "thwart" a plaintiff's right to contract under § 1981 and dismissing a claim under that section where a white cashier twice refused to serve a Hispanic customer because a different cashier agreed to serve him); Arguello v. Conoco, Inc., 330 F.3d 355, 358 (5th Cir. 2003) (stating that the circuit will recognize a § 1981 claim "where a customer has engaged in an actual attempt to contract that was thwarted by the merchant" (quoting Morris, 277 F.3d at 752 (emphasis added)); Bagley v. Ameritech Corp., 220 F.3d 518, 519-520, 521 (7th Cir. 2000) (dismissing a § 1981 claim because the retail store did not refuse to contract with a black customer where a white sales

---

[6]     The Sixth Circuit arguably has a more expansive interpretation of § 1981 in "commercial establishment" cases than Garrett.  See Christian v. Wal-Mart Stores, Inc., 252 F.3d 862, 872 (6th Cir. 2001).  To establish a § 1981 claim in that circuit, a plaintiff can show that he was "denied the right to enter into or enjoy the benefits . . . of [a] contractual relationship . . . [by] receiv[ing] services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory." Id.

Garrett commented on Christian's "broader construction" of § 1981 but did not adopt it.  See Garrett, 295 F.3d at 102 n.5.  As we have noted, "[a]part from the 6th Circuit, it does not appear that any other circuit court has embraced the Christian court's expanded formulation." Odunkwe v. Bank of Am., 335 F. App'x 58, 61 (1st Cir. 2009) (per curiam).

manager refused to serve him and gave him the finger but a different sales associate offered him help).[7]

We are bound to apply Garrett, and Hammond's pleadings fail to state a claim.

The judgment is affirmed.

---

[7] Successful § 1981 plaintiffs in other circuits have alleged far more than Hammond. See Green, 483 F.3d at 536, 539 (holding that § 1981 claim survives summary judgment where white sales clerk refused to serve two black customers, "discouraged her coworkers from assisting them," "treated them at all times with pronounced hostility," including calling them "f-cking n-ggers," and ignored the customers' plea that she leave them alone).