# United States Court of Appeals
## For the First Circuit

No. 20-1434

GERALD ALSTON,

Plaintiff, Appellant,

v.

STANLEY SPIEGEL,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]
[Hon. M. Page Kelley, U.S. Magistrate Judge]

Before

Lynch and Selya, Circuit Judges,
and Laplante,* District Judge.

Brooks A. Ames, with whom Brookline Justice League was on
brief, for appellant.
Naomi R. Shatz, with whom Martin R. Rosenthal, David Duncan,
and Zalkind Duncan & Bernstein LLP were on brief, for appellee.

February 19, 2021

---

* Of the District of New Hampshire, sitting by designation.

**SELYA**, **Circuit Judge**. Plaintiff-appellant Gerald Alston filed this civil rights action alleging violations of 42 U.S.C. §§ 1981, 1983, and 1985. The operative pleading — his second amended complaint (the SAC) — named as defendants the Town of Brookline, Massachusetts (the Town), the Brookline Board of Selectmen (the Board), certain members of the Board, the Town's counsel and human resources director, Local 950, International Association of Firefighters (the Union), and Stanley Spiegel (a Town Meeting member). Alston, a former Town firefighter who is black, alleges that the defendants discriminated against him on the basis of race; retaliated against him for exercising his First Amendment rights; and conspired to enforce the Town's policy of opposing racial equality, favoring white residents and employees, and retaliating against those who oppose the Town's views.

After Alston had filed his second amended complaint, the district court dismissed with prejudice his claims against Spiegel. See Alston v. Town of Brookline, No. 15-13987, 2017 WL 3387132, at *4-6 (D. Mass. Aug. 7, 2017). In serial orders, the district court later granted summary judgment in favor of the remaining defendants. See Alston v. Town of Brookline, No. 15-13987, 2020 WL 1649915 (D. Mass. Apr. 2, 2020) (addressing motions by the Town, the Board, and the remaining individual defendants); Alston v. Town of Brookline, No. 15-13987, 2020 WL 1615408 (D. Mass. Apr. 2, 2020) (addressing the Union's motion).

- 2 -

Alston appealed from all of these adverse orders. For ease in exposition, we have carved his appeal into discrete segments. In this opinion, we address Alston's appeal only insofar as it relates to the district court's dismissal of his claims against Spiegel.[1] We conclude that the allegations against Spiegel fail to state a claim upon which relief can be granted and, therefore, affirm the order of dismissal. We retain appellate jurisdiction over all other aspects of his appeal.

## I. BACKGROUND

We briefly rehearse the relevant allegations of the SAC, accepting as true the well-pleaded facts. See Santiago v. Puerto Rico, 655 F.3d 61, 72 (1st Cir. 2011). We then limn the travel of the case.

Alston is a black firefighter who began working for the Brookline Fire Department (the Department) in 2002. On May 30, 2010, Paul Pender, a lieutenant in the Department, left a voicemail on Alston's telephone in which he used a racial slur when referring to Alston. Alston reported the lieutenant's comment to the Department's chief operating officer, but the Department took no corrective action. The Department did, however, communicate to Pender that Alston had reported the incident. Pender responded by

_____

[1] Because Alston's claims against the other appellees raise distinct issues, we will decide them in separate and subsequent opinions. See, e.g., United States v. Santiago-Rivera, 744 F.3d 229, 231 n.1 (1st Cir. 2014).

telling Alston that reporting him "was the stupidest thing [Alston] could have ever done."

Alston alleges that the Board, the entity responsible for hiring, firing, and disciplining the Town's firefighters, failed to take appropriate action. Instead of disciplining Pender for his racist comment, the Board protected and rewarded the lieutenant. Alston asserts that, since the 2010 incident, the Town and other defendants, as well as the Department, have punished him in various ways, including the stonewalling of his complaints, insufficiently investigating those complaints, covering up the truth, encouraging the ostracization of Alston by other firefighters, denying him promotions, and constantly harassing him. These punitive actions allegedly continued even after Alston filed suit in state court and complained to the Massachusetts Commission Against Discrimination.

In the fall of 2013, the Boston Globe reported on Alston's state-court suit. At that point, Alston says, the Town increased its efforts to discredit his claims and force him out of the Department on a pretextual basis.

Against this backdrop, we introduce the appellee. Spiegel is an elected Town Meeting member and an appointed member of the Advisory Committee.[2] Alston alleges that Spiegel has

_____

[2] The record offers little information about the status of Town Meeting members, but the district court took judicial notice

- 4 -

frequent contact with the Board and that (until Alston sued him) he acted as an "unofficial surrogate" for the Board.

According to the SAC, Spiegel distributed a "letter to the editor," by email, to members of the Town Meeting on September 19, 2013. The letter, authored by a retired black fire lieutenant, had been passed out at a public meeting the day before by Selectwoman Nancy Daly. It attacked Alston's credibility and cast him in a negative light. In the same email, though, Spiegel directed Town Meeting members to a quote from Selectwoman Daly taken from that day's local newspaper in which she cautioned against a rush to judgment before the remainder of the facts relevant to Alston's complaint could be made public. Spiegel echoed Daly's sentiments about reserving judgment and noted only that the letter provided some "additional insight."

Alston further alleges that, in early 2014, the Town arranged for a psychiatrist to deem Alston "unfit for duty" and placed him on unpaid leave with the intent to terminate his employment. In December of that year, Alston's case received wider publicity in the media. Thereafter, Alston says, the Town

_____

of the fact that the Town has 240 Town Meeting members. See Alston, 2017 WL 3387132, at *3 n.5. So, too, the record is murky as to the precise nature and function of the "Advisory Committee." It indicates, though, that the Advisory Committee is linked in some way to the Town's governmental structure and that one of its roles is to approve financial settlement agreements to which the Town is a party. Such agreements may settle "claims for racial discrimination."

- 5 -

retaliated against him by giving Spiegel access to Alston's personnel file. Spiegel is alleged to have told several people gathered in the Board's public meeting room that he had such access as a result of his position as a Town Meeting member. He is also alleged to have told a woman who was wearing an "I support Gerald Alston" sticker that she would not support Alston if she knew the real story contained in his personnel file. In this conversation, Spiegel allegedly represented to the Alston supporter that he was speaking on behalf of the Town.

Additionally, Spiegel claimed (falsely, according to the SAC) that two black firefighters had told him that they did not support Alston. When questioned about his statements, Spiegel allegedly grew extremely agitated and put his face close to the supporter's face and raised his voice. The conversation ended when Spiegel shouted, "I'm disgusted," and left the room.

On February 13, 2015, Alston was placed on paid administrative leave. He asserts that despite the Selectmen's publicly conciliatory stance toward him, "they tacitly encouraged their unofficial surrogates, including advisory committee member and town meeting member, Stanley Spiegel to smear Mr. Alston and undermine public support for him." Just over a year later — on February 16, 2016 — the Board terminated Alston's paid administrative leave. Alston was formally dismissed from his

firefighter position by unanimous vote of the Board on October 5, 2016.

Alston filed suit in the federal district court roughly ten months before his formal discharge. Two months later, he filed an amended complaint, adding seven other plaintiffs. Various defendants filed motions to dismiss, which the district court referred to a magistrate judge. See Fed. R. Civ. P. 73(a). As relevant here, the magistrate judge recommended dismissing Alston's claims against Spiegel with prejudice for failure to state a claim. See Fed. R. Civ. P. 12(b)(6). Alston objected to this recommendation. The district court overruled his objection, except that the court dismissed Alston's claims against Spiegel without prejudice, thus allowing Alston to attempt to re-plead those claims. Alston proceeded to file the SAC in an effort, inter alia, to rejuvenate his claims against Spiegel. Once again, Spiegel moved to dismiss, and the district court referred his motion to the magistrate judge. The magistrate judge found that the factual allegations as to Spiegel were essentially the same as in the previously dismissed complaint, except for a few "minimal" changes, and again recommended dismissal with prejudice for failure to state a claim. Alston, 2017 WL 3387132, at *5. Alston objected to this recommendation but, in April of 2017, the district court adopted the recommendation and dismissed Alston's claims against Spiegel with prejudice. A hiatus ensued, during which the

- 7 -

district court disposed of Alston's remaining claims against the other defendants.  This timely appeal followed.

## II. ANALYSIS

We afford de novo review to a district court's order granting a motion to dismiss for failure to state a claim.  See Santiago, 655 F.3d at 72.  The district court's rationale is not binding upon us, and we may affirm an order of dismissal on any ground made manifest by the record.  See id. (citing Román-Cancel v. United States, 613 F.3d 37, 41 (1st Cir. 2010)).

When reviewing the grant of such a motion, "we accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor." Id.  Even so, we need not credit a plaintiff's "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  At bottom, a complaint will survive a motion to dismiss when it alleges "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A claim is plausible when the factual content adumbrated in the complaint permits a reasonable inference that the defendant is liable.  See Iqbal, 556 U.S. at 678.  "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture," dismissal is proper.  SEC v. Tambone, 597 F.3d 436, 442 (1st Cir.

2010); see Iqbal, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotations omitted)).

With these parameters in place, we zero in on Alston's claims against Spiegel. Generally, Alston alleges that the Town has "a policy, practice, and custom of opposing racial equality, enforcing racial subordination, engaging in affirmative action and favoritism towards white residents and employees, and retaliating against persons who protest racial discrimination." With specific reference to Spiegel, Alston pleads violations of 42 U.S.C. §§ 1981, 1983, and 1985 for "enforcing the Town's unconstitutional policy, practice, and custom," for retaliating against Alston for protesting the Town's "policy, practice, and custom," and for "discriminating against [Alston] on the basis of race." Relatedly, Alston pleads that Spiegel acted under color of law and violated clearly established law. We examine these plaints one by one.

## A. Section 1981.

As relevant here, section 1981 affords relief when racial discrimination precludes a plaintiff from entering a contractual relationship or when racial discrimination impairs a plaintiff's existing contractual relationship. See Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 476 (2006). The text of section 1981 provides in relevant part that "[a]ll persons within

- 9 -

the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The prophylaxis of section 1981 also extends to discriminatory dismissals, see Domino's Pizza, 546 U.S. at 477, and "prohibits not only racial discrimination but also retaliation against those who oppose [such discrimination]," Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 355 (2013) (citing CBOCS W., Inc. v. Humphries, 553 U.S. 442, 445 (2008)). To state a discrimination claim under section 1981, a plaintiff must show that he is a member of a racial minority, that the defendant discriminated against him on the basis of his race, and that the discrimination implicated the right to make and enforce contracts. See Hammond v. Kmart Corp., 733 F.3d 360, 362 (1st Cir. 2013).

As a preliminary matter, "[a]ny claim brought under § 1981 . . . must initially identify an impaired 'contractual relationship,' under which the plaintiff has rights." Domino's Pizza, 546 U.S. at 476 (quoting 42 U.S.C. § 1981(b)). The only identifiable contract that can be gleaned from the SAC is Alston's employment relationship with the Town. Although Alston does not specifically mention this contract in framing his allegations against Spiegel, we will infer (favorably to Alston) that his employment contract is the relevant contract for purposes of his section 1981 claim. Thus — to make out his discrimination claim

— Alston must plausibly allege that Spiegel's conduct was motivated by race and impaired Alston's employment relationship. Similarly — to make out his retaliation claim — Alston must plausibly allege that Spiegel's impairment of Alston's contractual relationship was as a result of Alston's opposition to the Town's racial discrimination. See Hammond, 733 F.3d at 362.

We begin with Alston's race discrimination claim. One insurmountable obstacle that blocks this claim is that the SAC never alleges that Spiegel's conduct was motivated by Alston's race. Nothing in the SAC suggests that Spiegel considered Alston's race either when deciding to distribute the letter or when confronting Alston supporters. Nor does the SAC include any allegation of racial animus on Spiegel's part. In the absence of such allegations, Alston has utterly failed to make out a claim for racial discrimination under section 1981. See Fantini v. Salem State Coll., 557 F.3d 22, 33-34 (1st Cir. 2009).

Alston's race discrimination claim runs headlong into a second — and equally insurmountable — obstacle: the SAC does not allege that Spiegel's conduct impaired Alston's employment relationship with the Town in any way. Alston does not allege, for instance, that Spiegel was his employer, that Spiegel had any influence on the terms and conditions of his employment, or that Spiegel had any role in the enforcement of his contract. In fact, the SAC contains nothing to connect Spiegel either to the contract

- 11 -

as a whole or to any particular provision in it. To the contrary, the SAC alleges that the employment relationship between the Town's firefighters and the Town is enforced through the Board. According to the SAC, the Selectmen are the "ultimate decision-makers with respect to the hiring, firing, promotion, demotion, and discipline" of the firefighters. Spiegel is not alleged to be a member of the Board and — based on the SAC's allegations — there is no principled way in which we can infer that Spiegel's conduct resulted in the Board's termination of Alston's employment.

None of this should be a surprise to Alston. Spiegel stressed the lack of connectivity between his actions and Alston's employment in motions to dismiss the various iterations of Alston's complaint, and the magistrate judge twice found this argument persuasive. See Alston, 2017 WL 3387132, at *4-6. In an apparent effort to plug this hole, the SAC alleges that "Spiegel has frequent contact with the Board of Selectmen, both formally and informally," and that "until named as a defendant in this lawsuit[,] [Spiegel] acted as an unofficial surrogate for the Board of Selectmen." But neither of these allegations can sustain a reasonable inference that Spiegel's actions had a detrimental effect on Alston's employment with the Town. The SAC does not describe the nature of the "frequent contact" and does not include any factual matter suggesting that the contact between Spiegel and the Board concerned Alston's employment.

Even when taken in the light most favorable to Alston, the allegations that Spiegel disseminated a letter casting Alston in a negative light and confronted an Alston supporter, in combination with the allegations that Spiegel has had contact with the Selectmen, do not make out a plausible claim for discriminatory interference with Alston's employment contract. So, too, the conclusory allegation that Spiegel was an "unofficial surrogate" for the Board is wholly devoid of factual support and is, therefore, insubstantial. Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 55 (1st Cir. 2006) (explaining that a court, when passing upon a motion to dismiss, should not "credit bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like" (internal quotations omitted)). We thus hold — as did the district court — that Alston failed to plead an actionable section 1981 race discrimination claim.

Given this holding, we need not linger long over Alston's section 1981 retaliation claim. To establish such a claim, a plaintiff must show that he undertook protected conduct, that he experienced an adverse employment action, and that the latter was causally connected to the former. See Pina v. Children's Place, 740 F.3d 785, 800-01 (1st Cir. 2014). On a motion to dismiss, "we must determine whether, as to each defendant, a plaintiff's pleadings are sufficient to state a claim on which relief can be granted." Sanchez v. Pereira-Castillo, 590 F.3d 31, 48 (1st Cir.

- 13 -

2009) (emphasis in original). Accordingly, Alston must plausibly allege Spiegel's role in the adverse employment action (in this case, his dismissal). See Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 16 (1st Cir. 2011) ("[E]ach defendant's role in the termination decision must be sufficiently alleged to make him or her a plausible defendant."); Peñalbert-Rosa v. Fortuño-Burset, 631 F.3d 592, 594 (1st Cir. 2011) ("[S]ave under special conditions, an adequate complaint must include not only a plausible claim but also a plausible defendant."). Here — as we already have pointed out — the SAC fails to link Spiegel to the Board's termination of Alston's employment and, thus, fails to state a claim for retaliation under section 1981.

In his reply brief, Alston seems to argue that Spiegel's comments to the Alston supporter themselves constituted retaliation "because they publicly broadcast the fact that Brookline had provided Spiegel with access to derogatory information in Alston's personnel file."[3] But these allegations do not make out a retaliation claim under section 1981 because they do not connect Spiegel to any injury to Alston's contractual relationship with the Town. Section 1981 is not a full suit of

_____

[3] We note, in passing, that Alston never distinguishes between the allegations that go to his section 1981 retaliation claim and those that go to his section 1985 retaliation claim. He generally describes Spiegel's conduct as "retaliation," eschewing any further amplification.

armor — a "strange remedial provision designed to fight racial animus in all of its noxious forms." Domino's Pizza, 546 U.S. at 476. Rather, it is a bulletproof vest, designed specifically to safeguard contractual relationships. See id. at 476-77 (concluding that Congress "positively reinforced" the contractual-obligation element of section 1981 claims). So whether or not Spiegel's comments were retaliatory in the ordinary sense, they were not retaliatory within the purview of a statute designed to protect contractual relationships from racial discrimination.

That completes this phase of our inquiry. With respect to section 1981, the SAC — though prolix — is notable more for what it does not say than for what it says. Pertinently, it does not allege that Spiegel's conduct was racially motivated, that Spiegel ever interacted with Alston, that Spiegel had even the slightest authority over Alston's employment, or that Spiegel had any involvement in any action that impacted Alston's employment. Although section 1981 may require more — a matter on which we take no view — these deficiencies alone make it evident that the district court did not err in dismissing Alston's section 1981 claims against Spiegel.

## B. **Section 1983**.

"Section 1983 is a vehicle through which individuals may sue certain persons for depriving them of federally assured rights" under color of state law. Gagliardi v. Sullivan, 513 F.3d 301,

306 (1st Cir. 2008).  To state a claim under section 1983, Alston must plead that he was deprived of a constitutional or federal right, that a causal connection existed between Spiegel's action and the deprivation of that right, and that Spiegel's actions constituted state action.  See Sanchez, 590 F.3d at 41; Gagliardi, 513 F.3d at 306.  To this end, Alston alleges that Spiegel discriminated against him on the basis of race and that Spiegel retaliated against him for exercising his First Amendment rights in protesting the Town's racial discrimination.

We start with Alston's claim of racial discrimination. We note, though, that the SAC does not explicitly invoke any particular constitutional provision in relation to Spiegel's conduct.  However, the SAC does invoke the Equal Protection Clause, U.S. Const. amend. XIV, § 1, with respect to Alston's parallel allegations concerning the Town's alleged discriminatory conduct. Since Alston gives us no other choice, we assume that his allegations of race discrimination against Spiegel likewise seek to vindicate his perceived rights under the Equal Protection Clause.

To establish an equal protection claim, Alston must allege facts indicating that, compared with others similarly situated, he was selectively treated based on an impermissible consideration (in this case, race).  See Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp., 246 F.3d 1, 7 (1st Cir.

- 16 -

2001).  Alston has failed to satisfy this requirement.  As previously discussed, see supra Part II(A), the SAC stumbles on the lowest rung of the ladder because it is bereft of any factual allegations suggesting that Spiegel distributed the letter and confronted Alston's supporters as a result of Alston's race.  There was, therefore, no plausible way for the district court to conclude that Spiegel's treatment of Alston was based on impermissible criteria.  See id.

As to this issue, there is a second (and equally dispositive) flaw in the SAC.  Alston's race discrimination claim is implausible because it fails to identify anyone who was "similarly situated" to Alston.  None of the allegations directed against Spiegel describe Spiegel's conduct toward other firefighters (let alone firefighters involved in employment disputes and litigation, like Alston).  This inadequacy, in and of itself, suffices to validate the dismissal of Alston's section 1983 race discrimination claim.  See Mulero-Carrillo v. Román-Hernández, 790 F.3d 99, 105-06 (1st Cir. 2015).

We are left with Alston's section 1983 claim of retaliation for his exercise of First Amendment rights.  See U.S. Const. amend. I.  To state such a claim, the SAC must show that Alston's speech was protected under the First Amendment (so as to shield him from adverse employment action in retaliation for such speech) and that Alston suffered an adverse employment action

caused by Spiegel.  See Gagliardi, 513 F.3d at 306.  Alston must also show "that the protected expression was a substantial or motivating factor in the adverse employment decision." Curran v. Cousins, 509 F.3d 36, 45 (1st Cir. 2007).

"[T]he 'adverse employment action' inquiry in the section 1983 context focuses on whether an employer's acts, viewed objectively, place substantial pressure on the employee's political views." Barton v. Clancy, 632 F.3d 9, 29 (1st Cir. 2011) (quoting Bergeron v. Cabral, 560 F.3d 1, 8 (1st Cir. 2009)).  This inquiry looks to "whether the defendants' acts would have a chilling effect on the employee's exercise of First Amendment rights." Id.  As such, the "pertinent question" here is whether Spiegel's actions constituted the kind of action that "would deter 'a reasonably hardy individual[]' from exercising his constitutional rights." Id. (quoting Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1217 (1st Cir. 1989) (en banc)).

Measured against this framework, Alston's allegations fall short of stating a plausible First Amendment retaliation claim under section 1983.  It is fanciful to think that Spiegel's distribution of a letter and his confrontation of two Alston supporters would deter a reasonable person from exercising his First Amendment rights against his employer.  These activities cannot, therefore, comprise an adverse employment action.  We add only a few words of explanation.

To begin, the SAC alleges that the letter — which attacked Alston's credibility — was neither drafted nor published by Spiegel.  It was written by another firefighter and had already been "distributed at a public meeting the day before" by Selectwoman Daly.  What is more, Spiegel's email forwarding the letter was addressed to fellow Town Meeting members, not to Alston, or to persons alleged to have any connection to Alston.  And in the email, Spiegel specifically warned against "rush[ing] to judgment."  Alston never alleges how he came across this email. More importantly, he never alleges that he knew about this email when considering whether to continue to pursue his grievances against his employer.  There is, therefore, no factual plinth upon which to rest a claim that Spiegel's unoriginal letter, presented to people unrelated to Alston with a warning not to rush to judgment, communicated to Alston that his exercise of his First Amendment rights spelled trouble and should cease.

Alston's allegations concerning Spiegel's interactions with the Alston supporter and others are equally impuissant.  The SAC alleges that over a year after Spiegel sent the email, he berated an Alston supporter — not Alston himself — and falsely claimed in front of that Alston supporter and others that two black firefighters were not supportive of Alston.  Here, too, the SAC lacks any factual allegations sufficient to establish how an event that did not take place in Alston's presence came to his attention.

Nor does the SAC allege how conduct that might or might not have been intimidating to the supporter wound up intimidating Alston himself.

In an effort to blunt the force of this reasoning, Alston argues that Spiegel's conduct, as described in the SAC, amounts to an implied threat to disseminate injurious information about Alston and is, therefore, the kind of conduct that would chill an employee's speech. In support, Alston relies almost exclusively on the decision in Ray v. Ropes & Gray LLP, 961 F. Supp. 2d 344 (D. Mass. 2013). His reliance is mislaid.

In Ray, the plaintiff alleged that he was discriminated and retaliated against by his employer, a law firm, on the basis of his race. See id. at 350. He filed a charge with the Equal Employment Opportunity Commission (EEOC) alleging as much. See id. at 351. The EEOC initially found no reasonable cause to believe that Ray's employer had discriminated or retaliated against him. See id. at 352. But on further consideration, the EEOC changed course and concluded that, while the evidence in fact did not support a finding of discrimination, there was probable cause to believe that the defendant had retaliated against Ray for filing the charge. See id.

Ray then mailed the EEOC's finding to a number of people, including Dean Martha Minow of Harvard Law School. See id. A legal online publication learned of Ray's contact with Dean Minow

- 20 -

and reached out to the defendant for comment. See id. In response, the defendant handed Ray's EEOC determination letter to the website, and the website then posted it online. See id. The letter contained "a recitation of evidence, including detailed information about Ray's performance reviews and a description of the internal investigation of Ray and his reprimand by the firm for alleged criminal misconduct with a subordinate." Id. The district court concluded that "[t]he threat of dissemination of derogatory private information, even if true, would likely deter any reasonable employee from pursuing a complaint against his employer." Id. at 360.

Ray does not advance Alston's cause. For one thing, Spiegel was neither Alston's employer nor a person alleged to be acting in the employer's stead. For another thing, even assuming that Alston was aware of Spiegel's conduct, the SAC does not allege that injurious information would come to light at Spiegel's direction; nor does it allege what that information might concern. This is in marked contrast to Ray, in which the released information was described as "severely damaging information." Id. And the final nail in the coffin is that Alston does not allege that Spiegel ever threatened to disseminate information extracted from Alston's personnel file. The only conduct alleged is Spiegel telling the Alston supporter that "she would not support Mr. Alston if she knew the 'real story' contained in Mr. Alston's personnel

- 21 -

file." Nothing in this statement allows us to infer that Spiegel communicated to Alston that he would spread detrimental information about Alston to others.

To sum up, we do not gainsay that a campaign of harassment may give rise to a First Amendment claim under section 1983. See Barton, 632 F.3d at 29; Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982). Here, however, the two seemingly independent events proffered by Alston in support of his First Amendment claim occurred over a year apart; and neither event is alleged to have been effectively communicated to Alston. Nor does the SAC allege that Spiegel had any contact at all with Alston (personal or professional) or that Alston even knew who Spiegel was. One swallow does not a summer make, and the two unconnected events described in the SAC cannot plausibly be characterized as a campaign of harassment sufficient to chill the speech of a "reasonably hardy individual[]." Agosto-de-Feliciano, 889 F.2d at 1217.

Let us be perfectly clear. We recognize that "[a] traditional employment relationship is not a prerequisite to a First Amendment retaliation claim." Barton, 632 F.3d at 28. But when — as in this case — the allegations essentially amount to a distant critic bad-mouthing or dissembling about an individual behind his back twice over the course of a year, the complaint lacks sufficient allegations of the degree of pressure on the

- 22 -

individual's views needed to state a plausible First Amendment retaliation claim. See id. at 29; cf. McKee v. Hart, 436 F.3d 165, 173 (3d Cir. 2006) ("Courts have not found violations of employees' First Amendment rights 'where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands.'" (quoting Brennan v. Norton, 350 F.3d 399, 419 (3d Cir. 2003))); Coszalter v. City of Salem, 320 F.3d 968, 976 (9th Cir. 2003) ("[W]hen an employer's response includes only minor acts, such as 'bad-mouthing,' that cannot reasonably be expected to deter protected speech, such acts do not violate an employee's First Amendment rights."). We therefore conclude that the SAC fails to allege the kind of conduct that would dissuade a reasonable person from exercising his First Amendment right to free speech. It follows inexorably that the district court did not err in dismissing Alston's section 1983 retaliation claim.

## C. **Section 1985**.

Section 1985 provides a remedy for acts of civil conspiracy in which two or more individuals conspire for the purpose of depriving another of rights or privileges accorded to them by law. See 42 U.S.C. § 1985(3). To plead an actionable claim under this statute, Alston must allege the existence of a conspiracy, allege that the purpose of the conspiracy is "to deprive the plaintiff of the equal protection of the laws," describe at least one overt act in furtherance of the conspiracy,

and "show either injury to person or property, or a deprivation of a constitutionally protected right." Pérez-Sánchez v. Pub. Bldg. Auth., 531 F.3d 104, 107 (1st Cir. 2008). On this score, Alston never gets out of the starting gate; the SAC fails to allege, either directly or inferentially, that any conspiracy existed.

Refined to bare essence, a conspiracy is a "combination of two or more persons acting in concert to commit an unlawful act." Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988). A civil rights conspiracy, though, must have certain other features. To plead such a conspiracy, a plaintiff "must plausibly allege facts indicating an agreement among the conspirators to deprive the plaintiff of h[is] civil rights." Parker v. Landry, 935 F.3d 9, 18 (1st Cir. 2019). When direct evidence of such an agreement is unavailable, "the plaintiff must plead plausible factual allegations sufficient to support a reasonable inference that such an agreement was made." Id.; see Earle, 850 F.2d at 843. Where, as here, a complaint aspires to allege a conspiracy in violation of section 1985(3), it must "elaborate[] []or substantiate[] [any] bald claims that certain defendants 'conspired' with one another." Slotnick v. Garfinkle, 632 F.2d 163, 166 (1st Cir. 1980); see Francis-Sobel v. Univ. of Me., 597 F.2d 15, 17 (1st Cir. 1979) (requiring "at least minimum factual support of the existence of a conspiracy"). Vague and conclusory allegations about persons working together, with scant specifics as to the nature of their

joint effort or the formation of their agreement, will not suffice to defeat a motion to dismiss. See Parker, 935 F.3d at 18.

In the case at hand, those are precisely the kind of allegations that Alston offers. He concedes that the SAC does not allege an express agreement but, rather, argues that an agreement can be inferred from "Spiegel and Daly's distribution of the same letter criticizing Alston in 2013 and from Spiegel's self-reported knowledge of the contents of Alston's personnel file in 2014." Inferences, though, are not infinitely elastic, and these allegations are manifestly insufficient to make out an agreement. Were the law otherwise, the plausibility standard would be reduced to mere rhetoric.

Once again, what the SAC does not say is enlightening. Alston does not allege any contact or conversation between Spiegel and Daly, nor does he allege any agreement between them even minimally related to him (let alone to the deprivation of his rights). The SAC does not even allege that Spiegel received the much-bruited letter from Daly. It tells us only that Daly distributed the letter at a public meeting, without including any information as to whether Spiegel was even in attendance. Although it may be within the realm of possibility that Daly and Spiegel collaborated to circulate the letter, nothing in the SAC's factual allegations permit a reasonable inference to that effect. A pleader is entitled to have reasonable inferences drawn in his

favor, but he is not entitled to the benefit of speculation unanchored to sufficiently supportive facts. See Peñalbert-Rosa, 631 F.3d at 596.

The same sort of deficiency dulls the force of the allegation that Spiegel had access to Alston's personnel file. The SAC alleges that the Town provided Spiegel access to that file, and nothing more. It does not identify Daly (or any person for that matter) as having collaborated with Spiegel in this endeavor. And even when viewed through the most forgiving lens, the SAC cannot plausibly be read to suggest that Spiegel and anyone else were acting in concert. After all, the SAC contains no factual allegations from which to infer that Spiegel and any other person reached a common understanding of what they were hoping to achieve. Because the SAC fails to plead any factual support for the existence of a conspiracy, the district court's dismissal of Alston's section 1985 claims was unimpugnable. See Francis-Sobel, 597 F.2d at 17.

## III. CONCLUSION

We need go no further. For aught that appears, Spiegel was at most a peripheral player in the evolving saga of Alston's difficulties with the Town, the Board, and the Department. Alston has had three opportunities to plead his claims against Spiegel, and he has come up empty. There simply are no facts pleaded in the SAC sufficient to ground a reasonable inference that Spiegel

is liable to Alston for any of the wrongs alleged.  Put bluntly, the facts set forth are too meager to lift Alston's claims over the threshold of conjecture.  We therefore affirm the judgment of the district court dismissing Alston's claims.  We retain appellate jurisdiction over Alston's appeal insofar as it relates to his claims against other defendants.

**So Ordered**.